So. Coal & Iron Co. v. Schwoon.

SOUTHERN COAL & IRON CO. *et al. v.* FRED SCHWOON *et al.*
SAME *v.* BRUSH CREEK COAL CO. *et al.*

(*Knoxville.* September Term, 1921.)

1. **EJECTMENT.** Burden of proving location of paper title on ground is on plaintiff.

In a suit in ejectment, the burden of the evidence is on complainants to show that their paper title can be located on the ground. (*Post, pp.* 206-208.)

2. **BOUNDARIES.** Proof of previously located monument corner, or marks from which boundary can be ascertained sufficient.

To establish boundary, it is not indispensably necessary that some particular corner or marked line should be proven to exist, but it is sufficient if it be proven to have existed or any monument, corner, or marks from which the boundaries called for can be satisfactorily ascertained according to any easy natural interpretation. (*Post, pp.* 206-208.)

3. **BOUNDARIES.** Proof held to raise a presumption that entry of state land designated forks of stream by looking down stream.

Where any entry of State land called for the beginning point on the right-hand fork of a stream, while the survey made shortly thereafter called for it by the same description as on the left-hand fork, and it was proved that the surveyors designated the forks of a stream by looking up stream, and that by following that rule a beginning point answering the description can be ascertained, it will be presumed the entry designated the forks by looking down stream, so that the beginning points were the same. (*Post, pp.* 208, 209.)

4. **BOUNDARIES.** Location of official survey controls entry.

The location of the official survey is controlling over inconsistent descriptions in the entry. (*Post, pp.* 209, 210.)

5. **BOUNDARIES.** Evidence held to locate survey on ground not-withstanding absence of marked corners or lines and discrepancies in descriptions.

Evidence that the calls in a grant could be located on the ground only at the points claimed by complainants, and that one corner so located was designated by an old settler as a corner pointed out to him by a son of the original surveyor, *held* to show the location of the grant on the ground, notwithstanding the absence of marked corners or lines, and certain discrepancies in the description. (*Post, pp.* 210-221.)

6. **TAXATION.** Order releasing land on which taxes had been paid by others does not prejudice claim of title.

Where taxes on the lands assessed against complainants had been actually paid by other persons asserting title to the lands, so that complainants could not be compelled again to pay the taxes there-on, it was proper to release complainants therefrom regardless of their actual ownership of land, so that an order for such release does not alone estop complainants from thereafter claiming the land. (*Post, pp.* 221-223.)

7. **ABANDONMENT.** Abandonment of vested legal title unknown without estoppel or adverse possession.

Divestiture of a vested legal title by abandonment is unknown at common law unless it results from some estoppel or adverse possession under the statute of limitations. (*Post, pp.* 223-225.)

Cases cited and distinguished: Phy. v. Hatfield, 122 Tenn., 696; Vt. 10; McLellan v. McFadden, 114 Me., 242; Houston Oil Co. v. Kimball, 114 S. W., 667.

Cases cited and distinguished: Phy v. Hatfield, 122 Tenn., 696; Bear Valley Coal Co. v. Dewart, 95 Pa., 72; Tennessee Oil Co. v. Brown, 131 Fed., 696.

8. **ESTOPPEL.** Injury is essential element of equitable estoppel.

To entitle a party to rely on alleged equitable estoppel, it must appear that he has been prejudiced in his rights thereby in some way, since estoppel is founded in fraud in the sense that the person

So. Coal & Iron Co. v. Schwoon.

estopped is considered to have misled another to his prejudice, so that it would work fraud to allow the true facts to be proven. (*Post, pp.* 225, 226.)

9. ESTOPPEL. Judicial estoppel may be invoked by party not prejudiced.

Though the doctrine of judicial estoppel is similar in principle to that of equitable estoppel, it may be invoked by any party, whether prejudiced or not. (*Post, pp.* 226-229.)

Cases cited and distinguished: McLemore Case, 111 Tenn., 639; Stearns Coal & Lumber Co. v. Jamestown Railroad Co., 141 Tenn., 203; Stamper v. Venable, 117 Tenn., 557.

10. ESTOPPEL. Unsworn statements by counsel, made in good faith, and which do not prejudice, do not establish judicial estoppel.

Judicial estoppel is based upon the principle that a party cannot take advantage of two inconsistent positions in judicial proceedings, and it is not established by mere proof of unsworn statements by counsel, made in good faith, and which do not prejudice the adverse party. (*Post, p.* 229.)

11. ESTOPPEL. Conclusions of law inconsiderately stated by party do not establish judicial estoppel.

Judicial estoppel is not established by inconsistent statements in prior judicial proceedings, even though made under oath where it appears that they were made inconsiderately, or in ignorance of the facts, and were mere conclusions of law. (*Post, pp.* 229-232.)

Case cited and distinguished: Tate v. Tate, 126 Tenn., 169.

12. ESTOPPEL. Statement of counsel in tax proceeding that complainant did not own land held not to create judicial estoppel.

Though proceedings in a county court to be relieved from taxes are judicial proceedings, a statement made in such proceedings by complainants' counsel, not under oath, that complainants did not own the lands assessed against them, which was a conclusion of law from a complicated state of facts, all of which were not known to counsel making the statement, does not establish judicial estoppel which prevents complainants from thereafter claiming the land. (*Post, pp.* 232-235.)

13. **PUBLIC LANDS.** Grant dates from entry of lands if special.

Priority of title which gives superiority between conflicting grants dates from the inception of the title upon which the grant is based, which is the date of the entry, and that is what is termed a special entry, or the date of the grant if the entry was not special. (*Post, pp.* 235-238.)

Cases cited and approved: McEwen v. Coal Co., 125 Tenn., 694; Iron Co. v. Railroad, 131 Tenn., 224.

14. **PUBLIC LANDS.** Special entry must refer to marks from which land can be ascertained by those acquainted with the neighborhood.

An entry of public lands, to be special, must in some part of it refer to something from which the land can be ascertained with reasonable industry by those acquainted in the neighborhood; the object of the requirement being not only to enable the surveyor to properly survey it, but to afford notice to subsequent enterers of the locality appropriated. (*Post, p.* 238.)

Case cited and approved: McEwen v. Coal Co., 125 Tenn., 703.

15. **PUBLIC LANDS.** Reference to location on well-known tracts makes entry special.

The requirement of the law that a special entry must be definitely located is met if the entry calls for a definite tract of land which is sufficiently well known in the neighborhood, and from the calls of which its location can be ascertained by the exercise of reasonable industry. (*Post, pp.* 238, 239.)

Case cited and approved: Bleidorn v. Pilot Mountain, etc., Co., 89 169.

16. **PUBLIC LANDS.** Grant cannot relate back to entry unless both cover the same land.

For a grant to relate back to the date of the entry on which it is based, it is obvious that the grant must cover the same land as the entry. (*Post, p.* 239.)

Case cited and approved: Kendrick v. Dallum, 3 Tenn., 224.

17. **PUBLIC LANDS.** Special entry must contain directions for location in addition to known beginning point.

So. Coal & Iron Co. v. Schwoon.

An entry is not special merely because the beginning point is definitely located, but it must also contain directions for its location with reference thereto, either by restriction or by operation of law, so that it will afford notice to subsequent enterers. (*Post, pp*, 239, 240.)

18. PUBLIC LANDS. Entry calling for complement in stated directions from beginning point is special.

An entry which has a special locative call, and calls to run in a stated direction for complement, is special because in such case the law requires the survey to be made in a square or oblong form, unless by doing so prior claims are interfered with. (*Post, pp*. 239, 240.)

Case cited and approved: Berry v. Wagner, 73 Tenn., 564.

19. PUBLIC LANDS. Calls for entry restricting form of survey must be special to make entry special.

Where the calls of an entry are restricted so as to prevent the surveyor from locating the land in the form of an oblong or square as required by law, of which subsequent enterers must take notice, the restrictive calls of the entry must themselves possess the requisite character of specialty, so as to enable the entry to be located by those familiar with the neighborhood. (*Post, p*. 240.)

20. PUBLIC LANDS. Calls of entry from known beginning point held not to make entry special.

Where an entry fixed a definite beginning point, but the subsequent calls were "thence east, south, east again, thence north," for complement, the surveyor could not comply with the requirement of an oblong or square survey by following the calls, and the calls themselves were not sufficiently definite to make the entry special. (*Post, pp*. 240, 241.)

21 PUBLIC LANDS. Survey held to show there was no relation between entry and grant.

Where the survey of the grant began at the beginning point called for in the entry, but did not follow the calls of the entry, and the lines were run in a zigzag course, so that it could not be determined therefrom how much, if any, of the entry was actually located by the survey and the grant, there can be no relation between the entry and the grant. (*Post, pp*. 241-243.)

So. Coal & Iron Co. v. Schwoon.

· Cases cited and approved: Douglass v. Harrison, 1 Tenn., 172; White v. Crockett, 4 Tenn., 183.

22. **PUBLIC LANDS.** Burden is. on claimant to show what lands in grant were contained in entry.

Where the claimants of a grant contended that the entry should be held special to the extent that the grant covered the same lands, the burden was on them to show what part, if any, of the lands granted were contained in the entry, and they cannot recover any of the lands on the strength of the entry in the absence of such showing. (*Post, p.* 243.)

23. **APPEAL AND ERROR.** Record will not be searched for evidence not referred to in appellant's brief.

Where claimants, on appeal from a decree for defendants, made no reference in their brief to the evidence with reference to the claim of one defendant, who in his brief set out evidence tending to show title in him, the court is not called on to search the record for evidence to controvert his claim, and no relief can be granted on the assignments of error in reference thereto. (*Post, p.* 243.)

24. **PUBLIC LANDS.** Evidence held to show calls for entry were sufficient to make it special.

An entry fixing the beginning point as the corners of another entry shown by the evidence to be well known in the neighborhood, and running with the lines of that entry, and the breaks of the mountain, and other entries and roads, *held* to make the entry special, so that the subsequent grant dated from the entry. (*Post, pp.* 243, 244.)

25. **PUBLIC LANDS.** Beginning point not definitely located in line called for makes entry vague.

Where an entry called for a beginning point on a designated line of a prior entry without locating the point at any particular place along that line, and there is nothing else in the entry to compel any specific location, the entry is vague, and not susceptible of being made special by proof. (*Post, pp.* 244, 245.)

Case cited and approved: Fowler v. Nixon, 54 Tenn., 719.

26. **ADVERSE POSSESSION.** Length of possession must be proved by clear and positive testimony.

So. Coal & Iron Co. v. Schwoon.

The rule that one seeking to show title by adverse possession has the burden of establishing it by clear and positive testimony applies to the length of time of possession, as well as to the character of possession. (*Post, pp.* 245-251.)

Cases cited and approved: Jones v. Coal Creek Min. & Mfg. Co., 133 Tenn., 183; Drewery v. Nelms, 132 Tenn., 254; Harrison v. Henderson, 54 Tenn., 335; Girdner v. Stephens, 48 Tenn., 280.

Cases cited and distinguished: Sully v. Childress, 106 Tenn., 177; Criner v. Cherry, 3 Shan. Cas., 496; Neely v. Luster, 54 Tenn., 354.

27. **ADVERSE POSSESSION.** Possession by timber lessee held that of tenant.

Where the purchaser of the timber on a tract of land under a contract giving him no right to possession of the tract constructed some houses thereon where he and his employees lived, his possession was that of tenant for the vendor of the timber on which the vendor can base a claim by adverse possession. (*Post, pp.* 251-253.)

28. **ADVERSE POSSESSION.** Possession of houses by timber tenant gives no claim to entire tract.

Where the purchaser of timber on a tract of land constructed some houses on a portion of the land, and occupied them as the vendor's tenant, the vendor's claim by adverse possession based on such occupation is limited to the land occupied, and does not extend to the entire tract. (*Post, pp.* 251-253.)

Case cited and approved: Northcut v. Church, 135 Tenn., 541.

29. **ADVERSE POSSESSION.** Holding of strip accidentally inclosed for defendant held not to give defendant adverse possession of entire tract.

Where the owner of a tract included in defendant's grant accidentally inclosed with his tract a strip of defendant's land, and agreed to hold possession of the land so inclosed for defendant, defendant cannot base a claim to the entire tract by adverse possession upon possession of that strip. (*Post, pp.* 253, 254.)

30. **ADVERSE POSSESSION.** Evidence held not to show possession for period sufficient to give title.

In ejectment, where complainants showed title from a superior grant, evidence *held* insufficient to establish the claim of defendant that his possession of the tract by the erection of a cabin thereon in which he lived part of the time had continued for the seven years necessary to perfect his title by adverse possession. (*Post, pp.* 254, 255.)

31. **PUBLIC LANDS.** Special entry is excluded from subsequent grant excluding legal claims.

A grant excluding therefrom the land within the described boundaries held by legal claims excludes an entry made prior to the grant if the entry was special (*Post, pp.* 255, 256.)

Case cited and distinguished: Bleidorn v. Pilot Mountain, 89 Tenn., 169.

32. **PUBLIC LANDS.** Entry may be either "special entry," "vague entry," or "indifferent entry."

In relation to specialty, entries of public lands are divided into three classes, special, which includes those which for locality contain references to historical, traditional, or well-known places, and which require no auxiliary proof, since the court can take judicial notice of the places, vague entries, which are those possessing no call for specialty or requiring more than reasonable exertions to ascertain such specialty, and which cannot be made good by extrinsic proof, and indifferent entries, which may be made special or vague by the proof in the case as to whether the places called for are located on the ground, and are sufficiently described and well known to be ascertainable by reasonable industry by those acquainted in the neighborhood. (*Post, pp.* 256-258.)

33. **PUBLIC LANDS.** Entry held indifferent and not special or vague.

An entry locating the beginning point on the headwaters of a designated river one-half mile north of a spring that rises near an improvement called the Ambrose Cabin is an indifferent entry, because the court will not presume the existence and notoriety of the objects called for; but the land is sufficiently located if such existence and notoriety are proved. (*Post, pp.* 258, 259.)

34. **PUBLIC LANDS.** Survey of indifferent entry raises presumption it is special.

So. Coal & Iron Co. v. Schwoon.

Where an entry is indifferent, the burden on the party claiming under it to introduce evidence the land can be located thereby is met by the official plat and certificate of survey, which show the objects called for, and which are sufficient in the absence of evidence to the contrary to raise the presumption that such objects existed and were well known in the neighborhood. (*Post, pp.* 258, 259.)

Cases cited and approved: Bleidorn case, 89 Tenn., 166; McEwen v. Coal Co., 125 Tenn., 694.

Case cited and distinguished: Wallen v. Campbell, 2 Tenn., 322.

35. ADVERSE POSSESSION. Possession under color of title to ungranted entry does not extend to limits of grant surrounding but excluding it.

Where the claimant of a grant which excluded therefrom a prior special entry took possession of the special entry under a deed giving color of title thereto, his possession extends only to the limits of the special entry, and he cannot base thereon a claim to the entire grant by adverse possession. (*Post, pp.* 259, 260.)

36. ADVERSE POSSESSION. Fact that possession was on another entry does not prevent its extension to entire tract held under different color of title.

The mere fact that an improvement had been in possession for more than seven years under color of title to a smaller tract including it does not alone prevent such possession from extending thereafter to a larger tract, including the smaller tract, under a new color of title. (*Post, p.* 260.)

Case cited and approved: Bon Air Co. v. Parks, 94 Tenn., 263.

37. ADVERSE POSSESSION. Possession ripened into title to smaller tract cannot be extended to larger tract under different color of title.

Where possession of improvements had ripened into title of a tract to which the possessor held color of title, so that the continued possession of the improvements could not be adverse to any one, the continued possession does not extend to a larger tract under a newly acquired color of title which included the former tract. (*Post, pp.* 260, 261.)

Cases cited and approved: Coal Co. v. Scott, 121 Tenn., 118; Daniel v. Coal & Iron Co., 132 Tenn., 510; Byrd v. Phillips, 120 Tenn., 14; Round Mt. Lumber Co. v. Bass, 136 Tenn., 687.

38. **PUBLIC LANDS.** Inferior grant cannot include ungranted entry excepted therefrom.

Where the grant under which defendant claimed was inferior to complainants' grant, it could give no title to any land, and *a fortiori* could not draw to it title to land that was excluded therefrom. (*Post, pp.* 261-263.)

39 **PUBLIC LANDS.** Subsequent failure to great excluded entry does not vest title in prior grantee.

Where the grant under which defendant claimed excluded therefrom when issued an existing valid entry, the subsequent failure of the enterer to acquire a grant based on the prior entry did not give the grantee title to such entry, but that title reverted to the state. (*Post, pp.* 261-263.)

40. **PUBLIC LANDS.** Entry beginning at white oak near a path is vague.

An entry locating the beginning point at a white oak, near a path cut out on the mountain, and also near the bluff of the gulf, is vague, and not susceptible of proof to identify the beginning point. (*Post, p.* 263.)

41. **ADVERSE POSSESSION.** Not limited to invalid grant where possessor also claimed under color of title.

Possession within the boundaries of an inferior grant is not limited to the boundaries of that grant where at the time it was instituted the possessor claimed under a tax deed giving color of title to the full extent of a superior grant. (*Post, pp.* 263, 264.)

42. **ADVERSE POSSESSION.** Tax deed held to convey color of title.

A tax deed which purports to convey the land, and shows that the persons in whose name the land was sold were the owners, gives color of title, though, as a matter of fact, the persons so named were not the owners. (*Post, pp.* 264, 265.)

43. **ADVERSE POSSESSION.** Possession under insufficient color of title may thereafter extend to boundaries of subsequent conveyances.

Even if a tax deed under which possession was originally taken was insufficient color of title to extend the possession to the entire

So. Coal & Iron Co. v. Schwoon.

tract, the possession by subsequent grantees, whose deeds purported to convey the entire tract, would extend to the land described by their deeds. (*Post, pp.* 264, 265.)

44. **ADVERSE POSSESSION.** Description in tax deed held sufficient to give color or title to entire tract.

A tax deed which does not on its' face identify the land conveyed thereby as a particular grant, but calls for the corners of another grant from which, under the evidence, it is apparent the description in the tax deed was intended to cover the first grant, is sufficient to give the color of title to that grant. (*Post, pp.* 264, 265.)

FROM HAMILTON.

Appeal from the Chancery court of Hamilton County.— Hon. W. B. GARVIN, Chancellor.

R. E. ROBINSON, W. C. ABERNATHY and FRANK T. FANCHER, for complainants.

FULTS & SCHOON, BROWN, SPURLOCK & BROWN, C. H. GARNER, SPEARS & SPEARS, L. V. WOODLEE and JOHN C. MYERS, for defendants.

MR. L. D. SMITH, Special Justice, delivered the opinion of the Court.

1. *General Statement of the Case and of the Question Presented.*—These are ejectment cases. In the first case styled the complainants assert title to and seek to recover a five thousand acre tract of land in Grundy county which may be conveniently referred to as grant No. 4936, that being the number of the grant issued by the State of Ten-

nessee from which the complainants deraign their title. In the other case the complainants assert title to and sue to recover another five thousand acre tract of land in Grundy county which may be conveniently referred to as grant No. 4940, that being the number of the grant issued by the State from which the complainants deraign their title.

That the complainants deraign a perfectly connected chain of title from the State was not disputed on the trial of the case in the chancery court, and is not questioned here. Both grants were issued by the State to Samuel Edmondson, and the defendants concede in their briefs that complainants are now the owners by regular conveyance of the Edmondson title, and make no question on that branch of the case—whatever title Edmondson had to the land by reason of the grants the complainants now have.

The defendants deny the right of complainants to recover upon the following grounds:

First: That the complainants are unable to locate the tracts of land sued for and described in the bills, and have failed to show that their title papers cover and embrace the land of the defendants.

Second: That the complainants are estopped to claim the land, because in a judicial proceeding in the county court of Grundy county in July, 1908, instituted by them for the purpose of having the assessment for taxes on these lands for 1907 and 1908 corrected, they disclaimed and renounced all claim to the land included within, and covered by grant 4940, and all except one thousand, eight hundred acres in grant No. 4936; that in that application complainants predicated their right to have the assessment corrected on the ground that the lands assessed to complainants were not owned by them.

So. Coal & Iron Co. v. Schwoon.

Third: That defendants' title is superior to that of the complainants, and each defendant claims as to his respective tract that he has the only true title to the land sued for and described in his or her or its answer.

Fourth: That defendants and those under whom they claim had been in possession of the land for more than seven years before the filing of the complainants' bill, and each of them relies upon and pleads the statute of limitations of seven years.

The chancellor was of the opinion that the complainants had failed to show that their title papers covered the land in dispute, and, as this was conclusive against complainants' right to recover, he did not consider or decide any of the other many questions which arise.

The cases were consolidated in the chancery court, and heard together, and come to this court upon the appeal of the complainants, all questions in both cases being raised upon one record.

2. *The question of location of the complainants' land* is common to both cases and to all defendants. If the complainants have failed to show that their title papers cover the land in dispute, then they must fail altogether. We may therefore conveniently consider this phase of the case first.

Grant No. 4936 and the other title papers of the complainants describe the land sued for in case No. 15802 as follows:

"On the waters of Collins river, beginning on a hickory tree, Peter Yates' southeast corner of his five thousand acre entry; thence south, crossing the left-hand fork of Collins river at one thousand poles, in all one thousand, one hundred poles, to a stake on the bluff; thence west

seven hundred thirty-four poles to a stake; thence with the mountain north eighteen degrees west seven hundred sixty poles to a stake; thence north forty-four degrees east four hundred forty poles to a black oak, Peter Yates' corner; thence with his several lines south forty-five degrees east one hundred twenty poles to a white oak; thence east one hundred eighty poles to a dogwood; thence north seventy degrees east four hundred thirty-four poles to the beginning.''

Grant No. 4940 and the other title papers of the complainants describe the land sued for in case No. 15806 as follows:

. "Situated in Grundy county, Tennessee, on the waters of Collins river, beginning on the southeast corner of an entry made in the name of Peter Yates on a hickory, thence running east with Elias Mayo's survey nine hundred poles to two Spanish oaks; thence north with the line of John Rogers and Sterling Savage eight hundred ninety-six poles to a hickory; thence west nine hundred poles to a hickory; thence south with said Yates survey eight hundred ninety-six poles to the beginning."

Thus it will be seen that the northeast corner of grant No. 4936 and the southwest corner of grant No. 4940 are the same, and that this common corner is the southeast corner of another grant by No. 4191, issued to Samuel Edmondson, known in this record as the Peter Yates grant, by reason of the entry upon which it is based having been made in the name of Peter Yates, and by which name we shall have occasion later on to refer to it.

The location of complainants' grants with reference to each other and to the Peter Yates grant is shown by the diagram appended.

So. Coal & Iron Co. v. Schwoon.

There is no difficulty whatever about the relative location of these grants, but the difficulty lies in locating them upon the ground.

It is admitted by the complainants that they have no other way of locating their lands on the ground except than by first locating the corner of the Peter Yates grant, from which point both of complainants' grants start, and it is conceded by the defendants that, if the complainants have successfully shown the location of the southeast corner of the Peter Yates grant to be as claimed by them, they have successfully located the lands described in the grants which form the basis of their title. The location on the ground claimed by the complainants as being the hickory or beginning corner of both grants, and as being the southeast corner of the Peter Yates grant and of the black oak or southwest corner of the Peter Yates grant, and the lines between these corners which constitute the dividing line between grant No. 4936 and the Peter Yates grant, are fully shown in the record and well understood by both sides; their position with reference to the streams, roads, and other natural objects are shown upon the maps and need not be stated more particularly here.

. The burden of the evidence on this point is upon the complainants. The rule of law which is to guide us in determining whether the complainants have met this burden is aptly stated in 1 Meigs' Digest, p. 540, as follows:

"Title to land cannot exist without boundary; the plaintiff must show a marked boundary, or some proof from which boundary can be ascertained, before he can say to the defendant, even though he is a naked possessor: 'I have a better right to possess this particular piece of land than you have.' But then, in order to establish boundary,

So. Coal & Iron Co. v. Schwoon.

it is not indispensably necessary that some particular corner or marked line should be proven to exist. If it be proven to have existed, or any monument, corner, or marks from which the boundaries called for in a grant or deed can be satisfactorily ascertained, according to any easy and natural interpretation, it is sufficient. Nevertheless a grant can be lost for uncertainty in its boundary, there being no means by which its boundary can be defined. But not if by any reasonable means the intention of the contracting parties can be ascertained."

With this rule in view, we proceed to examine the evidence and consider the arguments *pro* and *con* upon this question of location. We shall deal principally with the location of the lines and corners of the Peter Yates grant, called for in the complainants' grants, since complainants concede this to be necessary, and the defendants admit that if this is accomplished the complainants' lands are located as claimed.

The Peter Yates entry reads as follows:

"Peter Yates enters five thousand acres of land in Warren county, Tennessee, on Cumberland Mountain, on the headwaters of Collins river, beginning at a black oak standing on the bluff of the right-hand fork of Collins river, thence meandering said bluff eastwardly crossing Little Laurel; thence northwardly, thence westwardly; thence southwardly to the beginning, platting out all prior claims. October 10, 1835, Peter Yates, Locater."

The description of the land as found in the official survey and in the grant which was issued upon this entry is as follows:

"On Cumberland Mountain, on the headwaters of Collins river, beginning on a black oak standing on the bluff

of the left-hand fork of Collins river; running thence with said bluff south forty-five degrees east one hundred and twenty poles to a white oak; thence east one hundred and eighty poles to a dogwood; thence north seventy degrees east four hundred and thirty-four poles to a hickory; thence north passing a white oak marked as a corner, four hundred and ten poles, in all one thousand one hundred and forty poles; thence west seven hundred poles to a stake; thence south forty-five degrees west three hundred and thirty poles to a hickory; thence west eight hundred poles to a white oak; thence south forty-seven degrees east one thousand four hundred and sixty poles to the beginning, including and platting out two thousand and thirty-seven acres of older titles."

At the outset an important difference between the description contained in the Peter Yates entry and the description contained in the Peter Yates grant is observable. The black oak, or beginning corner of the entry, is described as being located on the bluff of the right-hand fork of Collins river, whereas the black oak or beginning corner of the grant is described as being on the bluff on the left-hand fork of Collins river. Upon this difference between the entry and grant is based the first point made by the defendants against the complainants' locations— that is, the grant should be located on the right-hand fork, as called for in the entry, and thus located it will not interfere with defendants' lands.

The proof shows that in the general neighborhood or locality of the complainants' land as they seek to establish it there are two forks of Collins river. The northernmost one of these forks is, and it is so shown on the maps, Savage creek. This is the left-hand fork looking up stream.

So. Coal & Iron Co. v. Schwoon.

The other fork is, and it is so shown on the maps, Big creek, or middle fork. This is the right-hand fork looking up stream. Big creek and the stream marked Middle fork come together above the point where Savage creek enters the stream.

In order for the entry and the grant to refer to the same location, it is necessary to consider that the enterer was describing the particular fork of the river by look-ing down stream, whereas the surveyor looked up stream. The proof shows that it was customary for surveyors when describing forks of streams to indicate them as left and right by looking up instead of down streams. There is no proof to show whether any such custom prevailed among enterers, but it is just to assume that the enterer described the stream by looking downward, since the pre-sumption of the law is that the surveyor made his sur-vey to conform to the entry, and, as he was surveying the entry for the enterer, both had in mind the same location. At any rate, the location of the official survey is control-ling, and it certainly locates the land on the northern fork.

We concur fully in what the chancellor said in his opin-ion on this point:

"The entry calls for the beginning corner to be on the bluff of the right-hand fork of Collins river. Hence it is argued that this grant must be located on the south fork of that river. But the grant calls for the left-hand fork, and, properly speaking, the left-hand fork is the north fork, which in this case is Savage creek. There is no proof that it was actually located on the south side of the river, or that it can be so located. On the contrary, com-

plainants' surveyors state generally that there is no place on that side where the calls can be made to fit the country. It is the calls of the grant which must control, even though this involves an obvious departure from the calls of the entry; but in this case the discrepancy can be explained by the not unnatural supposition that the enterer looked down the river, whereas the surveyor more properly looked up the river, in describing the fork. I do not think there is much force to this objection. The grant must be located on the north fork or not at all."

Therefore, in considering the question of whether or not the complainants have properly located their lands, we proceed upon the basis that the entry and the grant call for the same location; that, there is in fact no discrepancy, but harmony, in the calls, and that the particular bluff upon which the beginning corner is to be found is the bluff of the north fork, or what is known and shown on the maps as Savage creek, and which may be referred to further on in this opinion as the left-hand fork of Collins river. The location claimed by the complainants for beginning corner of the Peter Yates grant conforms to the location called for both in the entry and the grant, in that the corner is to be found on the bluff of the north fork of Collins river.

But the proof shows that the location of the beginning corner of Peter Yates' grant, as claimed by the complainants, is on the bluff opposite a point which is below the mouth of the north fork—that is, below the confluence of the two forks. From this fact it is contended by the defendants that the complainants' location of the Peter Yates corner is on the bluff of the main Collins river, and not on the bluff of the north fork of the river, and there-

So. Coal & Iron Co. v. Schwoon.

fore not in conformity to the calls of the grant. If we were dealing with a location which calls for the bed of the streams, this argument would be quite forcible, if not conclusive; but the location called for is not the thread of the stream, but the bluff of the stream. It is evident that the surveyor had in mind the bluffs of the right and left hand fork. The bluff on the north side of the stream was referred to as the left-hand fork. Certainly the bluff upon which the complainants locate the beginning corner of the Yates grant is not the bluff on the right-hand fork. These bluffs are high and prominent, and on the north side the bluff is continuous above and below the conjunction of the two streams, being broken for a short distance where Bolden's creek enters the left-hand fork, and even from the bluff continues around and is practically unbroken and faces in the direction of the north fork. There is nothing said in the entry or the grant about the bluffs of the main river, and no reference to any other bluffs than those of the right and left hand forks. The point of the complainant's location of the beginning corner of the Yates grant, while something like a mile above the conjunction of the two streams, is not inconsistent with the calls of the grant, but, on the contrary, is in entire harmony therewith, and the contention of the defendants does not accord with the rule of law that requires an easy and natural and reasonable location. There is no pretense that there is any point on the bluff above the conjunction of the two streams which will answer the other calls of the grant, and, if the location claimed by the complainants shall be found to fit in with the other calls, it will not do to say that the grant cannot be located by reason of the mere fact that the beds of the streams under the bluff come

together above a point opposite the location of the beginning corner.

It is not sufficient for complainants that the beginning corner of the grant as they locate it conforms to the call of being on the bluff of the left-hand fork of the river. This of itself is not sufficiently locative. The grant calls for a black oak tree on the bluff of the left-hand fork. If there was at the point claimed by the complainants a black oak marked as a corner, and its location was not in conflict with other calls of the grant, it might be said to be sufficient to locate the beginning point of the grant upon that black oak. As a matter of fact, there is no marked black oak at the point where the complainants claim the beginning corner is located. On the other hand, the absence of the tree will not serve to prevent its being located as the complainants contend if it is shown to be where other calls of the grant locate it. The first call, as we find it in the entry, is, "Thence meandering with said bluff eastwardly," and as we find it in the grant, "Running thence with said bluff south forty-five degrees east one hundred and twenty poles to a white oak."

It is conceded by the complainants that they have not shown any marked line running from the point where they claim the black oak is located to the white oak, but the complainants rely on the fact, which is established, that the bluff from the point claimed for the location of the black oak runs one hundred and twenty poles in the direction of south forty-five degrees east, and that there is no other place along the bluff on that side of the river which fills that description and other calls in the title papers. The complainants' location of this line accords with the description thereof found in the grant. This is

So. Coal & Iron Co. v. Schwoon.

not seriously controverted. Certainly the weight of the proof shows that the bluff from this point runs the distance and the direction called for in the grant. At the end of this line there is a white oak, but no marks on it to indicate that it was originally marked as a corner of this grant. Somebody had shaved the bark in the form of a belt around the tree, indicating that somebody had considered it as being distinguished from its fellows, but this particular tree is not sufficiently identified in the proof to enable it to be said therefrom that it is the original corner. But the proof shows that there is no other place along the bluff on that side of the river which will conform to the calls of this grant with respect to course and distance, and at the same time meet other necessary calls found in the Peter Yates grant and in the grants of the lands in dispute and of still another grant surveyed about the same time which calls for the Peter Yates grant. This is true notwithstanding the fact that many surveyors, some working in the interest of the complainants and others of the defendants, have made many surveys and have spent months of time in investigating and surveying in an effort to locate the Peter Yates grant. The defendants' principal surveyor, Mr. McKenzie, who was employed to make a thorough and diligent search for all evidence tending to locate this grant, spent months of time in the survey of the bluffs getting their courses, directions, and distances at all points in the neighborhood. He was able to find but one other point from which the bluff ran south forty-five degrees east one hundred and twenty poles, and that particular point is so located that it is impossible for it to fill other descriptions found in the grants.

There is nothing on the ground where the complainants claim the correct line to be to identify the next call in the grant, "east one hundred and eighty poles to a dogwood." There are no marked trees on this line, although at the end of the line there was a dogwood growth, and the proof shows that at this point the ground was practically devoid of other timber.

The next call is north seven degrees east, to a hickory, which is the beginning corner of both of the grants in controversy, and the southeast corner of Peter Yates' grant. At the point claimed by the complainants to be this corner there is a hickory tree with old marks thereon which complainants claim to be landmarks. But a block taken from this tree shows that the marks were made from eighty-five to one hundred years back, and some ten to twenty years prior to the date of the survey of the Peter Yates' grant. The marks themselves show to have been made with an axe rather than with a surveyor's hatchet, and in such a manner as to show that they were not intended to indicate a corner tree. Certainly they were not made at the time of the Peter Yates survey. Near this hickory tree was a white oak which had marked on it the letters X or Y and an H, indicating that the tree had been considered by some as one witnessing a corner of lands belonging to a Mr. Hill. The proof shows that one H. L. W. Hill claimed this tract of land, and considered this hickory tree a corner or a pointer to a corner of the Peter Yates tract of land. Corners of his land were frequently marked with the letter H.

It will be observed from an examination of the Peter Yates entry that the line running from the black oak or beginning corner reads:

"Thence meandering with said bluff eastwardly crossing Little Laurel; thence northwardly."

In running the lines of the location as claimed by the complainants from the beginning corner, this hickory tree is reached just after the crossing of Little Laurel creek.

Another important fact is, in the calls of grant No. 4940, we find the line runs from the hickory tree south, crossing the left-hand fork of Collins river at one thousand poles. It is therefore certain that the hickory tree marking the beginning corner of grants 4940 and 4936, and the southeast corner of the Peter Yates' grant, is located eastwardly from Little Laurel creek and northwardly from the left-hand fork of Collins river. Complainants' location of this point answers the descriptions above referred to. It is both eastwardly from Little Laurel and north of the left-hand fork of Collins river. This hickory is only five hundred or six hundred poles north of the left-hand fork of Collins river, whereas grant 4940 calls for crossing this fork of the river at one thousand poles south of the hickory. This discrepancy is a circumstance tending to show that complainants' location of the hickory is erroneous. But we find that the line of grant 4940 running south from the hickory, as given in the official survey, ends at a stake, thus showing that the line was not actually measured, but its distance estimated. Furthermore, all the maps locate the bluffs and the streams, and they demonstrate that there is no point east of Little Laurel, one thousand poles north of the left fork, from which the black oak on the top of the bluff, the beginning corner, could be reached by the calls of the Yates grant, no matter where on the bluff the same might be.

The hickory which we are looking for as the beginning corner of the grants in controversy must be found east of Little Laurel Creek and north of the left-hand fork, and it must be at a point which will be reached by the lines runnnig eastwardly from the black oak along the bluff where it extends—the distance and the direction as called for in the grant. Manifestly many points could be found from which these lines could be run and still conform to the grant if there were no fixed object called for in the grant by which to locate the place of the beginning, but we find that the black oak must be on the bluff of the left-hand fork of Collins river, and from that point the bluff must run at least one hundred and twenty poles in the direction of south forty-five degrees east, and must reach a hickory which is east of Little Laurel and north of Savage creek. Exactly these conditions are met by the location claimed by the complainant, and must be deemed sufficient unless there are other facts shown which destroy this conformity. It would be sufficient to destroy conformity if it were shown that more than one location on the ground answers the description, but there are no others. There is another Little Laurel, but it empties into the right-hand fork or the waters thereof, and it is impossible to find any point that is both east of that creek and north of the left-hand prong of Collins river, where this hickory must be found. So we know the land is not located there. There is also another point from which the bluff runs so as to conform to the call of south forty-five degrees east one hundred and twenty poles. But the proof shows this point is east of Little Laurel, and it would be impossible to run the calls of the grant from that point and cross Little Laurel Creek. Furthermore, to run the calls

from this location of the bluff the hickory would be located not on the left-hand fork of the river, but in the breaks of Jumping branch. It is true the Yates grant does not call for crossing Little Laurel, but the entry does, and we have held there is no conflict between the entry and the grant in this respect.

We find, therefore, that the location claimed by the complainant for the beginning corner of the grants in controversy substantially complies with the calls of the grants. And, there being no other location where these conditions exist, this particular bluff determines the location of the grant with all reasonable certainty as claimed by the complainants.

This view is confirmed by other significant evidence: H. L. W. Hill in his lifetime acquired title to the Peter Yates grant, and was alive and claiming it in 1889. About this time the Bridgeport Land & Improvement Company, complainants' predecessor in title, sent some surveyors into this section of the country to survey and locate the grants now in controversy. Learning that Mr. Hill had title to the Peter Yates grant and knowing that grants 4936 and 4940 called to begin on a corner of the Peter Yates grant, these surveyors called upon Mr. Hill. He went with them, and showed them this same hickory tree, now claimed to be the southeast corner, and pointed out that tree as being the southeast corner of the Peter Yates grant. These facts are testified to by these surveyors, and they are uncontradicted in this record. Mr. Hill himself kept a dairy in which he recorded the visit of these surveyors, and the fact that he pointed out to them this hickory tree as being the corner of the Peter Yates tract of land as he understood it. These surveyors and the dairy of Mr. Hill

both show that Mr. Hill got his information with respect
to the location of that corner from one Samuel Higgin-
botham, an old surveyor who ran out the lines of the Peter
Yates grant originally.   With this information obtained
by these surveyors from Mr. Hill, the then owner of the
Peter Yates grant, they undertook to locate the black
oak for the beginning corner, and in their survey found
that the lines ran with the bluff so as to conform to the
calls of the grant.   It appears in the evidence that the
surveyors for the complainants discovered the conformity
of this location to the grant without having any knowledge
or information that Mr. Hill had pointed out this same
location to other surveyors in 1889, or without having any
knowledge of the information contained in the dairy kept
by Mr. Hill.   One of these same surveyors, without know-
ing where the complainants had located the hickory cor-
ner, went to the place and pointed out to the complainants'
surveyors this same hickory corner as being the place
which Mr. Hill had pointed out to them many years before.

It is furthermore shown that some of these defendants
claim title to the lands in controversy through this same
man, Hill, and, while we do not think they are estopped
by the statement made by their predecessors in title, as
complainant cannot recover on an estoppel, nevertheless
it is significant that the owner of the land, who lived in
that section of the country, and who owned much land in
that neighborhood, and was well acquainted with the lo-
cation of the bluffs and streams, and who had pointed out
to him the corners of the Peter Yates grant by an old sur-
veyor, a son of the original surveyor, recognized this
hickory corner as the true location of the land, and es-
pecially when taken in connection with the further fact

that the lines running to this corner conform to natural objects called for in the grant, and there are no such natural objects anywhere else that meet the requirements of the grant.

There are some other circumstances that are persuasive of this same conclusion, but those which we have given are sufficient to show that the complainants have met the burden imposed upon them by law, and have shown that the lands described in the grants are located as claimed by them, so as to cover the lands claimed by the defendants.

3. *The Question of Estoppel.*—The complainant Southern Coal & Iron Company had been assessed for taxes by the Grundy county tax assessor for the year 1907 upon eight five thousand acre tracts of land, including the grants in controversy in this case, embraced within grants 4936 and 4940. In July, 1908, Col. W. V. Whitson, as attorney for the complainants, appeared before the county court of Grundy county and procured the county court to make and enter an order releasing the complainant from the payment of the taxes assessed against it for all of grant 4940, and all of grant 4936 except one thousand and eight hundred acres. That portion of the order pronounced by the county court releasing the complainant from the payment of taxes upon certain lands assessed against it reads as follows:

"Therefore, in view of the premises, it is the judgment of the court that the application of the Southern Coal & Iron Company be granted, and that the erroneous assessment of forty thousand acres to said company be corrected so far as the county of Grundy attains, and that they be assessed with eighteen thousand three hundred and ninety-nine acres, and, the said company having paid the taxes

for the year 1907 on the eighteen thousand three hundred and ninety-nine acres, they will be excused and released from the further payment of any lands in Grundy county, and they will be assessed for the acreage in said grants for the year 1908, in so far as the county of Grundy is concerned; and the county court hereby recommended in quarterly session that the comptroller, Frank Dibrell, release the said party of the taxes so as to conform to this decree, and applicant, Southern Coal & Iron Company, will pay the cost of this application and the entering of this decree, for which execution may issue."

The application of the complainant was made by the personal appearance of Col. Whitson, its attorney, and the decree was based upon the oral statements made by him to the court. There was no written petition sworn to by any officer or agent of the company nor was the statement of Col. Whitson under oath. The exact statement thus made by Col. Whitson does not appear, but we may safely conclude that the presentations were made in accordance with the recitations contained in the judgment itself. The judgment recites with respect to the grants in controversy in this case as follows:

Grant No. 4940. "It further appearing to the court that grant No. 4940, which is assessed to the Southern Coal & Iron Company, is also held, owned, and claimed by A. M. Shook and the heirs of H. W. Hill, and the taxes due the State and the county of Grundy are being paid by the said Shook and Hill heirs on said grant, is, therefore, wrongfully assessed to the said company."

Grant No. 4936. "It further appearing that inside of grant No. 4936 there is only one thousand eight hundred acres that is held, owned, and claimed by the Southern

Coal & Iron Company, and which is bound as follows: On the north by the Hill heirs; on the south by the Shook and Warner and Hill heirs; on the east by the Shook and Warner and Hill heirs; and west by the Hill heirs—and that inside of said grant, according to the best estimates that have been made, there is three thousand two hundred acres claimed by other parties, and who are paying the State and county taxes on same, and that rightfully only about one thousand eight hundred is properly assessable to said company, and which taxes on said amount have been duly paid to the tax collector of Grundy county."

At the time of the making of this order by the county court, the State and county taxes upon all of the lands in grant No. 4940, and all of the lands in grant 4936 except one thousand eight hundred acres, had been actually paid to the county by other persons who were asserting title to the land. Therefore neither the State nor Grundy county was entitled to compel the complainants to again pay the taxes thereon, and it was perfectly right and proper for the complainant to be released from the payment thereof, regardless of whether the complainant was the actual owner of the land or not. It follows, therefore, that the mere procurement of the order releasing the complainant from the payment of taxes could in no way operate to prejudice their title to the land, nor to estop them from proving and asserting their ownership thereof. But th order releasing the complainant from the payment of taxes was based not only upon that proper and legitimate ground, but also because it was made to appear that grant 4940 was owned and claimed by other persons, and that only one thousand eight hundred acres of grant 4936 were

owned and claimed by the Southern Coal & Iron Company.

The defendants have pleaded this action of the complainant in procuring this release from taxes as an estoppel against it from now being permitted to assert and prove its ownership of the land. This contention of the defendant is based upon the theories: First, that the conduct of the complainants operated as an abandonment and a renouncement of its title to this land; Second, that the conduct of the complainant constituted an estoppel against it to assert and prove its ownership to the land; and, third, that the rule of what is termed judicial estoppel is applicable.

In passing upon these contentions, it is necessary to have in mind some additional facts in connection with this application of the complainants. The complainants, a foreign corporation, had its place of business in another State, and its officers and agents lived in another State. They had employed as their attorneys to look after their interest in this land the law firm of Whitson & Mercer, of McMinnville, Tenn. The matter of attending to this particular business for the complainant was in charge of Mr. Mercer, who was a land lawyer. When it became known to the complainant that it had been assessed for taxes with the full acreage of the land covered by its title papers, and that the taxes on a large part of it, including all of grant 4940, and a part of 4936, had been paid by adverse claimants, and not knowing just how much land, if any, within these grants they could hold, and their right to hold any being disputed and involved in complications common to titles in the mountain sections of the State, it was determined to apply for a correction of the assessment against

So. Coal & Iron Co. v. Schwoon.

the company. A surveyor, Mr. Havron, was employed to make a report to the company's attorneys, indicating therein what portion of.the lands the company could probably hold. He made up such a report. The report itself does not appear to be in the record, and Mr. Havron testifies that, according to his recollection, he did not report that all of grant 4940 could not be held by the complainants. With this information secured by the attorneys of the complainant, and Mr. Mercer, who was in direct charge of the complainants' lands as attorney, being unable to give the matter attention, his partner, Col. Whitson, undertook in an oral statement to make representations to the court such as are recited in the order, with the view of getting a modification of the taxes against his client. In the oral statement made by Col. Whitson to the county court he did not undertake to give the court the facts upon which the claim of his client depended, but his statement with respect to the claim and ownership of the land by his client was but his own opinion, based upon information which he had received of the extent of his client's claim and ownership in the land. There was no misrepresentation of actual facts upon which his client's title depended, but it was a statement of the conclusions reached by him from the information which he did have, given to the county court in good faith, and for the purpose of relieving his client of an obligation which in his opinion was unjust. For the sake of the argument upon these questions, it must be assumed that the complainant is the real owner of the land, but that it cannot be heard to assert that ownership by reason of the matters stated.

First. Did this conduct of the complainant amount to an abandonment of his title? It is difficult to conceive of

such a thing as an abandoned title in Tennessee, under the previous decisions of this court. In every case where the question has arisen, certainly in all the cases which have been cited by counsel, it has been held that there was no abandonment. This result has invariably followed because:

"In order to justify the conclusion that there has been an abandonment there must be some clear and unquestionable affirmative act indicating the purpose of repudiating the ownership."

In the case of *Phy. v. Hatfield,* 122 Tenn., 696, 126 S. W., 105, 135 Am. St. Rep., 888, 19 Ann. Cas., 374, an abandonment of title was relied upon, based upon the fact that neither the owner nor her heirs had ever paid any taxes or had ever occupied the land, or paid any special attention to it, but, in holding that this did not constitute an abandonment, this court announced the proposition above quoted as being the substance of the previous decisions of the court upon that point. The court further said:

"We also think the true view of the question is expressed in the following excerpt from *Bear Valley Coal Company* v. *Dewart,* 95 Pa., 72, 78:

"An abandoned title is not transferred to an adverse claimant, or person who first seizes the land, but it falls back to the State, and by its extinction sometimes makes a younger and conflicting title good. The doctrine of abandonment does not apply to a perfect title, but only to imperfect titles. In favor of a junior warrant or settlement right after a long lapse of time, an imperfect title by warrant . . . may be presumed to be abandoned, t such presumption cannot be made of a perfect title. That is never reinvested in the State on such principle.

After the land has been located and patented it will not fall back because it is a derelict, nor for the owner's neg-lect to pay the taxes."

A correct statement of the rule of law in connection with the question of abandonment is found in the brief of the 'efendant upon this question, wherein it is said:

"A full legal title to land can be divested by abandon-ment only when the circumstances thereof are sufficient to raise an estoppel to assert title, or when possession is acquired by one in consequence of the abandonment and held under a claim of right for the statutory period of limitations. When there is no estoppel or limitations there can be no abandonment that will affect the right of the holder to the legal title."

See, *Caledonia County School* v. *Howard,* 84 Vt., 10, 77 Atl., 877; *McLellan* v. *McFadden,* 114 Me., 242, 95 Atl., 1025; *Houston Oil Co.* v. *Kimball* (Tex. Civ. App.), 114 S. W., 667.

The rule is perhaps more succinctly and properly stated by Judge LURTON in *Tennessee Oil Co.* v. *Brown,* 131 Fed., 696, 65 C. C. A., 524:

"Divestiture of a vested legal title by 'abandonment' is unknown at common law, unless it result from some es-toppel or adverse possession under a statute of limita-tions."

Such circumstances as are pleaded in this case are more properly to be judged of by the principles of estoppel rather than abandonment. Whether the facts are sufficient to work an estoppel is another and different question.

Second. In order for the matter pleaded to constitute an equitable estoppel, it must appear that the pleader has

been prejudiced in his rights in some way thereby. Estoppel has its foundation in fraud, considered in its most general sense: not that it · is necessary for .there to be intentional fraud, but the person estopped is considered as having, by his admissions, declarations, or conduct, misled another to his prejudice, so that it would work a fraud to allow the true state of facts to be proven. 10 R. C. L., pp. 690, 691. Bisph. Eq., section 28, Bigelow, Estp., 437. ·

Third. "The rule that a party will not be allowed to maintain inconsistent positions in judicial proceedings is not strictly one of estoppel, partaking rather of positive rules· of procedure based on manifest justice, and to a greater or less degree on the orderliness, regularity,· and expedition of litigation."

However, the rule of judicial estoppel is undoubtedly similar in principle to the doctrine of equitable estoppel, the difference being in the application of the principle. In other words, in *Hamilton* v. *Zimmerman,* 5 Sneed, 48, it was said that the doctrine of equitable estoppel has— "its foundation in the obligation under which every man is placed to speak and act, according to the truth of the case; and in the policy of the law to suppress the mischiefs from the destruction of all confidence in the intercourse and dealings of man, if they were allowed to deny that, which by their solemn and deliberate acts, they have declared to be true."

This doctrine, · as we have seen, can only be invoked generally by persons who have been prejudiced. But the exception which entitles any party, whether prejudiced or not, to invoke the doctrine constitutes what has been re-

ferred to in the decisions as judicial estoppel. As was said by the court in *Hamilton* v. *Zimmerman, supra*:

"And this doctrine applies with peculiar force, to admissions or statements made under the sanction of an oath, in the course of judicial proceedings. The chief security and safeguard for the purity and efficiency of the administration of justice, is to be found in the proper reverence for the sanctity of an oath."

Or, as stated in the opinion of Mr. Justice BEARD, in the *McLemore Case*, 111 Tenn., 639, 69 S. W., 338: "The policy of the law will not permit any one to gainsay what he has deliberately sworn to in the course of a judicial proceeding."

It would seem from the statement of the rule taken from the cases above mentioned that the doctrine of judicial estoppel applies only to admissions or statements made under the sanctity of an oath in the course of a judicial proceeding. If the rule be limited to statements under oath in a judicial proceeding, then it could not be properly invoked in this case, for the reason that the conduct of the complainants pleaded as an estoppel consisted only of an oral statement by the complainants' attorney. It was not a statement of the company itself, or any of its agents, sworn to or required to be sworn to.

But it is argued that the rule is not limited to sworn admissions or statements made in the course of judicial procedure. The case of *Stearns Coal & Lumber Co.* v. *Jamestown Railroad Co.*, 141 Tenn., 203, 208 S. W., 334, is cited in support of that contention, wherein Mr. Justice GREEN, delivering the opinion, said:

"While the law of judicial estoppel is ordinarily applied to one who has made oath to a state of facts in a former

judicial proceeding which in a later proceeding he undertakes to contradict, yet it is frequently applied, where no oath is involved, to one who undertakes to maintain inconsistent positions in a judicial proceeding."

The case just above quoted from was one in which the complainant sought to recover certain lands from a railroad company which had appropriated the land under the power of eminent domain, alleging that the railway company had no authority in law to exercise that power, and in this same suit undertook to enjoin an action which it had brought in another court to recover the value of the property taken and damages, upon the assumption that the railroad company was clothed with authority to exercise the power of eminent domain. The court held that the complainant was estopped upon the theory that it would not be permitted to take these inconsistent positions with reference to the same subject-matter of litigation upon the theory that to do so would violate the rules of procedure based on manifest justice, and have a tendency to interfere with the administration of justice.

In the case of *Stamper* v. *Venable,* 117 Tenn., 557, 97 S. W., 812, the position was taken in the original bill that a certain paper was void because its execution had been procured by fraud and undue influence, and treated the paper as being a deed. On the appeal the same party undertook to change the ground of assault, and to insist that the paper writing was not a deed, but testamentary in character. To this situation the court applied the rule invoked here. The reason for making the application is found in the language of Mr. Bigelow, which was quoted by the court in this connection, to-wit:

"If parties in court were permitted to assume incon-
sistent positions in the trial of their causes, the usefulness
of courts of justice would in most cases be paralyzed. The
coercive powers of the law, available only to those who
consent to its exercise, could be set at naught by all. But
the rights of all men are in the keeping of the courts, and
consistency of proceeding is  .  .  .  required of all those
who come in or are brought before them. It may accord-
ingly be laid down as a broad proposition that one, with-
out mistake induced by the opposite party, who has taken
a particular position deliberately, in the course of litiga-
tion, must act consistently with it. One cannot play fast
and loose."

The reason for the application of the rule would not
require its limitation to statements made under oath, but
may be extended to judicial proceedings in which incon-
sistent attitudes or conflicting positions are taken with
reference to the same subject-matter. We do not think
the rule should be extended so as to bind the parties to
the unsworn statements of their counsel where such state-
ments are made orally by counsel in a wholly different
controversy, and which are made in good faith, and which
in no way prejudice the rights of others involved in the
case where the doctrine is invoked.

In this case, while the proceeding in which this order
was pronounced is of judicial character, it was neverthe-
less not a litigated proceeding, but an *ex parte* application
made in good faith, whereby the defendants were unaf-
fected, and in which the questions which determine the
ownership of the property were not at all involved. But,
if it be conceded that the proceeding was one to which
the doctrine could be applied, and even if the statement

had been made under oath in a judicial proceeding so as to bring it fully within that phase of the rule, nevertheless it is not applicable in this case for still another reason.

A well-recognized exception to the application of the rule is stated in the leading case of *Hamilton* v. *Zimmerman,* and affirmed in the case of *McLemore* v. *Railroad.*

"Admissions or declarations made *in pais,* are often entitled to little or no consideration, because made inconsiderately or in ignorance of the facts, or not correctly understood or reported. And even when made with more deliberation, and under oath, it may be made to appear that they were made inconsiderately or by mistake; and if this be so, the party ought certainly to be relieved from the consequences of his error."

The reason for the exception is that the rule is intended to "Suppress fraud and to prohibit the deliberate shifting of positions to suit the exigencies of each particular case that may arise concerning the subject-matter in controversy."

This exception was enforced in the McLemore Case under these circumstances. It was an action of ejectment in which the defendants relied upon the validity of what was known in that record as the Williams title. In a previous case the railroad company had denied the validity of the Williams title in their pleadings. It was held not to be estopped, because in the first place the averments contained in these pleadings were considered mere conclusions of law concerning the title rather than a statement of facts deliberately made with due knowledge. Speaking of this situation, the court said:

"We are satisfied that any statement, concerning the title to Broadway [the designation given the property in-

volved], which may have been made on behalf of any of the various interests in the various litigations which have arisen, from time to time, concerning this property, could not be more than the expression of an opinion, and that no statement can be said to have been made so considerately, and with such knowledge of the facts, as to estop the parties. This property has been a fruitful source of litigation for a great number of years, and, from an examination of the immense record in this cause, we are not prepared to apply a rule of law, intended to prevent injustice, to such a complicated state of facts as is shown to have existed concerning the title to this particular property."

In *Tate* v. *Tate,* 126 Tenn., 169, 148 S. W., 1042, Mr Justice NEIL cites and analyzes very many, if not all, the cases in which this particular doctrine has been invoked. The case involved the title to property growing out of the construction of a will. It appeared that the same parties had brought two bills prior to the one in which this question was raised, and took positions antagonistic to the position previously taken, and upon this it was insisted that judicial estoppel arose against the complainants. It was held that judicial estoppel did not apply. After stating the rule and citing the cases, and analyzing some of them, the court said:

"We do not think that the present case falls under either of the foregoing authorities. The bills referred to did not purport to state any fact within the knowledge of the complainants therein, but only a construction of the will of Mrs. Tate's mother. This will was a matter of record, and was open to examination by every one. No one can be said, in a legal sense, to have been misled by such a con-

struction, since the construction of a writing is a pure question of law. Of course, if in the suit referred to, rights had been based upon the construction stated in the bill, and assented to, and acted upon by another person interested therein, a different question would arise; but we have no such question here."

Applying these principles to the facts of the present case, we conclude that the proceedings taken in the county court at the instance of the complainant cannot operate to estop them from asserting and showing their ownership of this property. The question of the complainants' ownership of the land was undoubtedly a matter about which even men capable of passing upon the question might reasonably differ. The title depended upon many complicated questions of law and fact.

The inability of the complainant to locate its land; the fact that it had not done so at the time; the difficulties which had been encountered in the efforts which had been made to locate the land; the question of the superiority of conflicting grants and the title by adverse possession—were matters which were not fully known and understood by the complainants at the time. All this information was not even before Col. Whitson when he appeared before the county court and represented that his clients were not the owners of the land. Col. Whitson's authority in the matter was limited to that of procuring a correction in the assessment. He was not undertaking to pass upon the complicated questions of fact and law necessary to be known in order to determine whether his clients actually owned the land. He did not undertake nor purport to present to the court the questions of fact upon which he made his representation as to the result thereof. This action was

not taken with the view of defrauding anybody, but was made in good faith, based upon the information which the attorney had.

Under these circumstances it would convert this equitable principle, which has been applied in order to prevent fraud and to conduct orderly conduct in the administration of justice, into an instrument of wrong and injustice, and have the effect to deprive the complainant of property which it is otherwise entitled to. If this action of the complainant had proven prejudicial to the defendants, or if, with a full knowledge of the facts, they had been misrepresented in this proceeding in the county court merely for the purpose of avoiding the payment of an honest obligation, a different situation would arise. If this representation had been made under oath by officials of the company or those directly interested in the ownership of the property, the court might be constrained to apply the rule; but, since the statement was not made under oath in any pleading, and was not made by the parties themselves, but by their counsel, forming but his opinion based upon information which he had, and in good faith, without any intention of defrauding anybody, or avoiding any just obligation, we are unable to concur in the view advocated by the defendants that these complainants should lose their property by reason thereof.

4. *Conflicting Grants.*—Another contention of the defendants is that the lands in dispute are covered by other grants, under which they claim, which are superior to the complainants' grants. As there are several defendants claiming under different grants, it will be necessary in order to have a clear understanding of the different ques-

tions presented under this defense to separate the different claims of the different defendants.

As heretofore shown, suit No. 15802 relates to the land within complainants' grant No. 4936. The defendants interested in that case are:

(1)   The heirs of H. L. W. Hill, to whom it will be convenient to refer as the Hill heirs, claim the conflict with complainants' grant under grant No. 5054 issued to H. L. W. Hill, March 24, 1837, based on entry No. 3963, made March 26, 1835, and also under grant No. 5055, issued to H. L. W. Hill, March 24, 1837, based upon entry No. 3964, made March 25, 1835. The location of these two grants of the defendants with reference to each other and to the complainants' grants are shown upon the map marked Exhibit No. 1 to the deposition of F. T. Fancher, by large red lines drawn around the boundaries thereof, the complainants' grants being indicated on the map by purple lines drawn around the boundaries. Grant No. 5054 is not shown on the map filed by the defendants, but grant No. 5055 is shown and marked on said map in error as being grant No. 5054. The relative locations are not important on this question, except to show that there is a conflict between the boundaries of complainants' grants and the boundaries of the defendants' grants, and there is no dispute in the record with respect to the conflict, if complainants' location of their grants is assumed to be correct.

(2)   E. E. Green bases his claim to a portion of the land in controversy upon grant No. 5232, issued to Stephen Haight May 24, 1837, based on entry 4347, made December 23, 1836.

(3)   Virgil Hill claims a portion of the land in dispute under grant No. 6062, issued to George R. Smart, April 9,

1838, based on entry 4252, made October 16, 1836.

(4)   Elkins McCarty Company claims a portion of the land in dispute under the George R. Smart grant No. 6062, above referred to.

The foregoing constitute the claims of all the defendants involved in case No. 15802.

Suit No. 15806 relates to the land within the complainants' grant No. 4940. The defendants rely upon some of the grants which conflict with grant 4936, as well as some other grants. They claim a portion of the land in controversy under grant 5054, and also under grant No. 5055, the dates of which, as well as the numbers of the entries upon which they are based, and their dates, have heretofore been stated in connection with the conflict with complainants' grant No. 4936.

A large portion of the conflict with this grant 4940 is claimed by the defendants under grant No. 5107, issued to Samuel B. Barrel, April 27, 1837, based on entry No. 3097, made June 21, 1830.

Under the system for granting the public lands in operation under the acts of the legislature it frequently happened as in this case that different grants were issued at different times conveying the same land to different grantees, and this has been the occasion of much litigation over land titles in Tennessee, resulting in the judicial decisions which form a large part of the early Tennessee Reports, and largely constitute the land law of Tennessee. It has become elementary that superiority of title is to be found with the holder of the title prior in date. This is not necessarily nor always determined by the date upon which the grant was issued, but it is to be determined from the date of the inception of the title upon which the grant is based.

The grant will have its inception at the date of the entry provided the entry be what has in law often been termed a special entry to the extent that the entry and the grant cover the same land. If the entry be not special, then the date of the grant based thereon is the inception of the title.

With these principles in view, we proceed to ascertain the question of priority between the complainants' grants and the grants under which the defendants claim.

Complainants' grants were issued, 4936 on January 6, 1837, and 4940 on January 7, 1837.

The complainants do not claim in this case that the entries upon which their grants are based are special. Indeed such a contention could not be sustained in view of previous decisions of the court. The specialty of the entries upon which complainants' grants are based depends upon whether the Peter Yates entry is itself special, since complainants have no other calls to make them special than the calls for the Peter Yates grant. The specialty of the Peter Yates grant was involved in the case of *Mc-Ewen* v. *Coal Co.*, 125 Tenn., 694, 148 S. W., 222, upon substantially the same evidence appearing in this case. It was there held that the Peter Yates entry was not special. The same question arose again in *Iron Co.* v. *Railroad*, 131 Tenn., 224, 174 S. W., 1122, upon a slightly different state of facts.

It results, therefore, that complainants' title had its inception on the date of the grants, to-wit, January 6 and 7, 1837.

The entries upon which the defendants' grants 5054 and 5055 are based were made March 25, 1835, and therefore, if they are special, the title of the defendants thereunder is superior to that of the complainants.

Entry No. 3964, upon which grant 5055 is based, reads as follows:

"Suzanne Hill enters five thousand acres of land in Warren county, Tennessee, on the top of Cumberland mountain, beginning on the northeast corner of a location in the name of H. L. W. Hill, grant [entry] 3963, and running north and west for complement, platting out all older claims."

This entry contains no locative call whatever upon which to make it a special entry except the call for the northeast corner of entry No. 3963. We must, therefore, look to entry No. 3963 to determine the specialty of entry 3964, because, if entry No. 3963 is special itself, the call in entry 3964 for one of its corners will render 3964 special, other conditions being complied with.

Entry 3963 is the entry upon which grant 5054 is based. It reads as follows:

"H. L. W. Hill enters in the office five thousand acres of land in Warren county, State of Tennessee, on the side and top of Cumberland Mountain on the waters of Hill creek and Collins river, beginning on a stake about one quarter mile west of the southwest corner of grant 297 in the name of Isaac Hill, covering what is called the Lynn Cabin place, running thence east to said southwest corner; thence with the western, northern, and southern boundary line of said grant to the southeast corner, thence east, south, east again, and then north, so as, after getting into the barrens, to run near along the brow or bluff of the mountain, that formerly (forms) the valley of Collins river, and so as to include the complement after platting out all land held by legal claims."

This entry contains no call therein sufficient to make it a special entry other than the call for the southwest corner of grant No. 297 covering what is called the Lynn Cabin place. So it is necessary to look to the evidence with respect to grant 297 in order to determine whether 3963 is itself special, for, unless entry 297 is special, the other entry calling for it must fail with respect to specialty.

Grant No. 297 reads as follows: "There is granted by the said State of Tennessee unto Isaac Hill a certain tract or parcel of land containing fifty acres by survey bearing date of the 9th of May, 1827, lying in said county on the waters of Hill's creek, and Collins river, on the side of the mountain and running with the various meanders of the mountain, beginning on a stake, running north forty-seven poles to a buckeye, near a spring branch, thence north thirty-four degrees west sixty-eight poles to a dogwood; thence north forty-nine degrees west, thirty-five poles to an ash; thence north seventy degrees west eighteen poles to a dogwood; thence south sixty degrees east one hundred and seventy-five poles to the beginning, including a spring."

This grant was issued March 10, 1828.

An entry to be special must in some part of it contain a reference to some thing or natural mark from which, either singly or together, the land can be ascertained with reasonable industry by those acquainted in its neighborhood. The object of this requirement being not only to enable the surveyor to properly survey it out, but to afford notice to subsequent enterers of the locality appropriated by the first enterer. *McEwen* v. *Coal Co.*, 125 Tenn., 703, 706, 148 S. W., 222.

This requirement of the law is met with if the entry calls for some definite location upon another tract of land

which is sufficiently well known in the neighborhood, and from the calls of which its location can be ascertained by the exercise of reasonable industry. A number of entries of this character which have been sustained by the courts are referred to in *Bleidorn* v. *Pilot Mountain, etc., Co.,* 89 Tenn., 169, 204, 15 S. W., 737. The proof shows that this Isaac Hill tract of land, entry 297, called for by entry 3963, was well known in that community at the time the Hill entry was made, and that it meets all of the requirements of the law with respect to notoriety to render it a special entry.

But the complainants contend that entry 3963 is not special, and the grant based thereon cannot relate to it so as to make the entry the inception of the title thereunder, even though it be special, so far as the location of the beginning corner is concerned, because the other calls of the entry which define its locality are indefinite, and contrary to law, and the grant was not surveyed so as to cover and does not cover the land described in the entry.

In order for a grant to relate to the date of the entry upon which it is based, it obviously must cover the same land. An enterer could not locate his entry in one place, have it surveyed in another place, and be permitted to say that the entry was the inception of the title to the land granted, for the reason that the land granted is not the land entered. *Kendrick* v. *Dallum,* Cooke, 224.

And an entry is not special merely because the beginning point is definitely located, but it must contain directions for its location with reference to the beginning point either by restriction or by operation of law, so that it will afford notice to subsequent enterers of the place of its location. An entry which has a special locative call, and calls to

run north or south and east or west for complement, is special, because in such case the law directs the method of its survey, and requires it to be located either in a square or oblong form, unless doing so would interfere with the lines of prior claims or with navigable streams, in which latter case it may deviate from the required form. If is because of this requirement of the law that entries in a checkerboard system, such as were involved in the Bleidorn Case, and other cases, have been held to be special where the locative call in the initial entry met the requirements of the law with respect to specialty. *Berry* v. *Wagner,* 5 Lea, 564.

The surveyor, of course, is required not only to survey the land in the form of a square or an oblong, but he must also comply with the directions of the entry. If the calls of the entry are restricted so as to prevent the surveyor from locating the land in the form of an oblong or square, as he is required to do by law, of which subsequent enterers must take notice, then the restrictive calls of the entry must themselves possess the requisite character of specialty. If the entry be so indefinite and uncertain as to the location of the land with respect to the locative call as that the surveyor may locate it anywhere without reference to form, manifestly subsequent enterers would have no means of ascertaining where the land was intended to be located. This necessarily follows from the principle that an entry in order to be special must furnish notice of its location to persons acquainted in its neighborhood in order that subsequent enterers may avoid taking up land covered by prior claims.

An examination of this entry 3963 shows that a definite beginning corner is fixed. Subsequent owners, by reason

of the notoriety of that point, must take notice that the land lies either in the form called for in the entry or in the form which the law required the surveyor to run it out. The calls of this entry are not of the character which enables one to say in what direction from this locative call the land is to be found. It is impossible to know whether it is to lie northeast, northwest, southwest, or southeast from the beginning corner. The most favorable construction of the entry would be that the enterer intended that it should be left with the surveyor acting in accordance with the law to locate it. The subsequent calls from the beginning are:

"Thence, east, south, east again, thence north, so after getting into the breaks to run near the brow of the bluff of the mountain."

If it had said running east, thence south, and around for complement subsequent enterers would know that the land lay in an oblong or square form southeast of the beginning corner.

But the call is to run east, south, and then east again, and then north. To comply with these calls the surveyor might run a very short distance east and then a short distance south and then run a short distance east again, or he might run a longer distance on each of these lines. He is not restricted with respect to distance. In running these lines he is not acting in accordance with the law, and therefore a situation exists from which it would be impossible for any subsequent enterer to know where the land was to be located. This is especially true since there is no evidence to show that any of the other calls would locate the land at any particular place with reference to the beginning corner. There is no evidence here that there

were any older and prior claims on the grant, or any natural obstructions to justify this sort of a call from which a subsequent enterer might judge of the location of the land. Certain it is that it could not be surveyed in an oblong or square form and comply with the calls of the entry, and the calls are so indefinite as to afford no notice whatever of the location of the land. This is made more manifest by an examination of the form and shape of the land in which it was run out by the surveyor. After leaving the calls of the fifty-acre tract, the surveyor ran east, as called for, the short distance of five poles; then he ran south for the short distance of thirty-four poles. At this point he abandoned the next call of the entry, and, instead of running east again, and then north, and then to the beginning, so as to include the quantity, he ran various and sundry lines in almost every direction, zigzagging here and there, as a result of which the land appropriated under the entry was in an unknown form, the southeasternmost corner being some ten miles from the northwestern corner, and the northwest corner being some distance northwest of the beginning corner. The whole boundary, long on some sides, short on others, narrow in places, and wide in places, is such that it is impossible to tell just how much if any of the land described in the entry was actually located by the survey and the grant. The grant certainly does not cover the same land as the entry; that is, if it covers any portion of it, it covers lands that the entry could not possibly cover. Under such circumstances there can be no relation between the entry and the grant. *Douglass* v. *Harrison*, 1 Overt., 172; *White* v. *Crockett*, 3 Hayw., 183.

The defendants contend, however, that the entry should be held special to the extent that the grant does cover the same land. This would be true if there was any way by which it could be definitely determined just what land was in the entry that is also covered by the grant. It is quite uncertain from an examination of the maps whether any part of the entry conflicts with the complainants' grant. At any rate, the variance is so great that the burden must be put on the defendants to show what part, if any, of it could be laid on the complainants' land, and defendants have not met this burden.

It follows, therefore, that complainants' grants are superior to the defendants' grants 5054 and 5055.

With respect to the claim of the defendant E. E. Green, it is sufficient to say that the complainants nowhere in their brief make any reference to this claim. There is no reference to the record for proof from which the court can ascertain the nature of this claim, the grants upon which it is based, or its location. Complainants' assignments of error with respect to this claim are wholly deficient, and no relief can be granted them with respect to this defendant for this reason. The defendant Green has submitted a brief making reference to his claim, and presenting his contentions. The court does not feel called upon to search the record for evidence to controvert his claim, in the absence of any reference thereto by the complainants in their assignments of error or brief.

The claim of Elkins McClarty Company is based upon grant 6062, issued to George R. Smart, April 9, 1838, based on entry 4252, dated August 16, 1836. The entry of the Smart grant antedates that of the complainants' grant, and therefore defendant's title is superior if the entry be

special. The entry calls to begin on the northeast corner of a thirty-five-acre entry in the name of Wm. Duggin, near the Beersheba Springs, and to run west with the line of that entry until it strikes a fifty-acre entry of the said Duggin, and thence northwardly with the lines of that tract along the breaks of the mountain until it strikes another entry in the name of Wm. Duggin, near the Dan Springs. It runs thence westwardly along the breaks of the mountain to a road leading from Walkers and Griswold; thence up the valley so as to include the vacant land between the top of the mountain and John Rogers and others. All of these locative calls are shown by the proof to have been well-known points in that neighborhood, and fully establish the specialty of this entry. To the extent of the conflict between this and the complainants' grant, the complainants must therefore fail.

The defendant, Virgil Hill, claims a tract which is a part of the Smart grant just referred to in connection with the claim of the Elkins McClarty Company. Its superiority depends upon the specialty of the Smart entry, and as to this tract the result must be the same as stated in connection with the other claim.

Some of the defendants in the case involving grant No. 4940 claim portions of that grant under grants 5055 and 5054, which we have heretofore considered in connection with the other case, and with respect to which it follows that, to the extent of the conflict of these grants with 4940, the issue is determined in favor of the complainant.

The principal conflict with the complainants' grant 4940 is the claim of the Brush Creek Coal Company, which, outside of the grants 5055 and 5054, is covered by grant 5107.

We do not understand the defendants to seriously contend that grant 5107 can relate to the entry upon which it is based. It reads as follows:

"No. 3097. A. S. Goodlett and Isaac Earthman enter five thousand acres of land on the spur of Cumberland Mountain and on the waters of Collins river, to begin on the south boundary of an entry made in the name of Isaac Littler and Christopher H. Stum for five thousand acres of land and to run east and southwest and north for complement."

There is no proof of the notoriety even of the Littler and Stum tract. Even if there were such proof the entry would still be lacking in specialty for the reason that the beginning point is not definitely located in the line of the land called for. Nor is there anything else in the entry to compel any specific location. Such an entry is vague, and not susceptible of being made special by proof. *Fowler* v. *Nixon,* 7 Heisk., 719.

5. *Adverse Possession.*—Questions of adverse possession arise in each of the cases, and in connection with practically every claim of all of the defendants. We will first consider the questions of adverse possession arising in connection with the case involving grant No. 4936.

The defendant Elkins-McClarty Company relies upon what is termed in the record as the Hobbs possession to perfect its title to the conflict between its claim and this grant of the complainant.

The improvement involving this question is known in the briefs of counsel as the Hobbs possession. The facts with reference to it are that one John Arnfield acquired title to the Smart grant by deed on the 7th of December, 1854. Some time prior to the commencement of the Civil

War one Hobbs, as tenant for Arnfield, went on the land and built a house and cleared up a piece of land on the side of the mountain. The evidence is not clear as to the date when this land was first occupied. The court is asked to infer that this must have occurred about 1855 or 1856, by reason of the evidence which showed that Hobbs lived in the house at least ten years, and that he left it soon after peace was made either in 1865 or 1866. The rule of law is that one seeking to show title by adverse possession has the burden to make out by clear and positive testimony such adverse possession as will bar the title. *Jones* v. *Coal Creek Min. & Mfg. Co.,* 133 Tenn., 183, 180 S. W., 991; *Drewery* v. *Nelms,* 132 Tenn., 254, 177 S. W., 946.

This rule applies to the length of time as well as to the character of the possession. The proof does show that this possession by Hobbs continued for a least ten years, and in that respect the evidence is sufficiently certain; but it is contended by the complainants that the period of time of the Civil War must be deducted, and, if this contention is sound, then the proof is not sufficient to make out a period of seven years outside of the war period, so that the real question is whether the period of the war is to be deducted from the time that this improvement was occupied.

The objection made by the defendants to deducting this period of time is that there is no affirmative pleading by the complainant that the courts were closed in Grundy county, and that proof of the fact is not admissible, nor can the court take judicial notice thereof without an issue being made in the pleadings. In support of this contention we are cited to the case of *Sully* v. *Childress,* 106 Tenn.,

117, 60 S. W., 499, 82 Am. St. Rep., 875. That was an action to collect a note, and the defense was based upon the statute of limitations by proof that the defendant was absent from the State during a part of the period, and it was held by the court that:

"The doctrine is now clearly established that, if the statute of limitations is relied on as a bar, the plaintiff, if he would avoid it by any exception in the statute, must explicitly allege it in his bill or specially reply it, or, what is the modern practice, amend his bill."

It had been held in *Criner* v. *Cherry,* 3 Shan. Cas:, 496, that, in order to defeat the bar of the statute of limitations, it was permissible to show by proof that the courts of the county were closed during a period of the time necessary to complete the bar, without any pleading, and upon that case the court of chancery appeals had held in *Sully* v. *Childress* that an affirmative pleading to bring the case within the exception of the statute was not necessary. This court held that the doctrine of *Criner* v. *Cherry* was not applicable, and with respect to it said:

"The case of *Criner* v. *Cherry* was decided in 1875, and, so far we are advised, it was reported for the first time in 3 Shannon's Cases, 496, published in 1899, and has not been cited in any subsequent case on the point now in issue. It is not supported by any authority, and is wholly irreconcilable with recent decisions of this court."

In another part of the opinion, the court said: "The case of *Criner* v. *Cherry,* 3 Shannon's Cases, 496, to the extent it holds that a suspension of the statute of limitations may be shown by proof, without direct issue made by the pleadings, is not authority, and is overruled."

As stated, the particular question presented here was not involved in *Sully v. Childress*. The court there was not dealing with the question of the suspension of the statute of limitations, but with an exception to the statute. It was not dealing with the question of whether or not a pleading was necessary in order to make proof relevant that the courts of the country were closed during the requisite period as was the case in *Criner v. Cherry*. Hence it is argued that the statement in *Sully v. Childress* overruling *Criner v. Cherry*, was *obiter dicta*, and should not be followed. The reasoning of the argument is: There is a clear distinction between the two cases, and good reason for applying it in a case like *Criner v. Cherry*, or the case at bar. The difference is that in this case the effort is not to show an exception to the statute, but rather that there was no statute of limitations in force during the period of the Civil War. The defendant pleaded and relied upon the statute of limitations. The burden was upon the defendant to show that he had adverse possession of the land during the period when the statute of limitations was in force. If the courts of Grundy county were closed so that there was no opportunity for a suit to be commenced and prosecuted, then the statute was not running at all. In other words, the provision of the statute which gives perfect title to one in possession under color of title for a period of seven years contemplates that during this period the courts are open, and it was not the intention of the legislature that there should be any bar during the time when the courts were not open. This interpretation of the statute with respect to its application during the period of the war is ably discussed in an opinion by Judge FREEMAN in the case of *Harrison v. Henderson*, 7 Heisk.,

335, and again applied by the court in *Neely* v. *Luster,* 7 Heisk., 354. In the former case the executor therein was seeking to escape liability under the statute of limitations, the period of the war constituting a part of the time necessary to complete the bar. The opinion does not disclose affirmatively that there was no pleading raising the question, but, if the reasoning in that case be sound, clearly no pleading would be necessary. The period of the war was deducted in that case, and the plea of the statute of limitations was overruled. The question was stated by the court to be—"whether the suspension and closing of our courts, and cessation practically of all civil remedy for the enforcement of all legal rights, did not of itself operate to stop the running of the statute; or in other words, whether the statute by its fair terms and meaning applied to such a state of things, and was operative at all, while it lasted."

The court then proceeded to reason that, in the enactment of the statutes, the legislature had in mind that the courts would be open to litigants for the prosecution of claims. Otherwise the statute would be violative of our Constitution.

The court said among other things:

"We think that if a law had been passed by the legislature, enacting in so many words, that a man's right to recover his debt due on a contract, should be barred in six years, or any other period, notwithstanding there were no courts in operation or open in which he could bring his suit, such law would have been declared void, as violative of the provisions that the court should be open, and every man entitled to his 'remedy by due course of law' for injuries done him to his lands, goods, person, or reputation.

It would also have been held void as impairing the obligation of contracts . . . which must necessarily consist in an efficient remedy for their enforcement. We seriously doubt whether any lawyer will maintain that the legislature could, by direct enactment, constitutionally pass a law embodying in terms the principle maintained, though not decided, in the case of *Girdner* v. *Stephens,* 1 Heisk., 280. If this be true, much more must it be held that they have not done so, when on the face of the statutes no such result was intended; on the contrary the very opposite is fairly implied:"

If it be conceded that the courts of Grundy county were closed, that there was no statute of limitations in force during that time, such being the case, the defendant must make out the period of the statute of limitations during the time the statute was in force, and he cannot invoke a period when the statute was not in force by reason of the closing of the courts. In this view of the case no pleading was necessary on the part of the complainant. The defendant had simply failed to show possession for a period of time when the statute of limitations was in force. It is conceded, and properly so, in the brief of the defendant that, if the act of 1865 had been passed before the completion of the period of time required under the statute, the act would operate as a repeal or suspension of the statute itself, and a pleading raising this question would not be necessary. For the very same reason, any other condition which enables the court to say that the statute of limitations was suspended and not in operation has the same effect as an act of the legislature; for the act creating the statute must be treated as intending to apply

the statute only when there are courts of the country in operation for the enforcement of the rights of parties.

With respect to the soundness of this reasoning, we express no opinion, for the reason soon to be stated.

This question of pleading is pretermitted, and not decided, since we have already held that the grant under which defendant claims this conflict is superior to that of the complainants, and, furthermore, it appears that an improvement had been maintained and continued on this property continuously since the war up to the institution of this suit, and it is not necessary to count the period during the war to make out the defense completely. So that the complainant must fail in so far as the conflict with the defendant Elkins-McClarty Company is concerned, both upon the ground that the complainants' title is inferior and that the defendant's title has been made good by adverse possession.

The defendant Eliza Deakin relies upon a possession known in the record as the Deakin or Tate land, and upon the conflict of complainants' boundary with that claimed by her in her answer. The proof shows that in the year 1902 Mrs. Deakin sold the timber on this land by written contract to one George Gillem, and that in 1903 Gillem built some houses on the land which he and persons working for him used while he was engaged in removing timber, for some four or five years, and after he got through removing this timber Mrs. Deakin continued to have some of these houses used and occupied by a tenant up until this suit was brought. The time of the use by Gillem and Mrs. Deakin together made a period of more than seven years. Neither one was in possession for a period of as much as seven years. The question presented on these facts and this

phase of the case is whether the occupation of the house by Gillem will inure to the benefit of Mrs. Deakin. The proof showed that Gillem used and occupied these houses as tenant of Mrs. Deakin, but it is argued that, Gillem having a contract for the timber, his occupation of the land while removing the timber must be treated as innuring to his own benefit, and as presenting a case similar to a holding of the surface of land where the mineral had been segregated, under the principle of *Northcut* v. *Church,* 135 Tenn., 541, 188 S. W., 220, Ann. Cas., 1918B, 545, or as, if Mrs. Deakin had conveyed a right of way to a railroad, the holding by the railroad would be independent and not as a tenant. One difficulty with this contention is that the timber contract did not provide for any use whatever of the land by Gillem. He had no right thereunder to occupy any portion of it with houses or for any other purpose than to cut and remove the timber and to go in and out for that purpose. There is no similarity whatever in the relationship of these parties under the contract and that contended for by the complainant. The proof simply shows that Gillem occupied these houses as the tenant of Mrs. Deakin. However, the proof does not show that any other portion of the land was leased or held by Gillem than the houses and the small lots around them. So far as the proof shows, the tenancy was limited to the houses and lots; he had no right to the use or occupancy of any other part of the land. Under these circumstances his occupancy of the houses cannot be treated as possession of the entire boundary of the land, and cannot operate in favor of the owner further than the actual occupation. It is good to that extent.

The defendant Mrs. Betty Barnes relies upon an improvement known as the Mondy or Coppinger possession, situated on the conflict between grant 4936 and that portion of the Hill lands, grant 5055, which were allotted to her in the partitioning of her father's lands. The facts of this possession are, in substance:

One Coppinger owned a one hundred-acre tract of land inside the Hill boundaries. Between the years 1859 and 1865 Coppinger by accident constructed his fences over his line and upon the Hill lands, and had a strip of about seven poles wide and twenty poles long of Hill's land inclosed with his own. One day Hill, passing through the community, discovered that Coppinger's fence was over on his land, and he entered into a conversation with Coppinger on the subject. This conversation as worded or related by the witnesses was this: Hill said to Coppinger, "Jess, you have got your fence over the line a little bit, and if you are holding possession for me it is all right, but if you are going to try to hold for yourself you had better move your fence a little," to which Coppinger replied, "All right." Hill then said, "Just clear up as much of my land as you want; you need a little more opening back this way; it will make your place look better." This is all that was said between the parties. Thereafter Coppinger held this accidental encroachment for Hill, and later on the purchasers of the Coppinger tract continued to hold it in the same way. We think clearly that this holding cannot be treated as an adverse possession of the entire Hill boundary. In the first place, it was merely accidental, and therefore there was nothing to indicate that it was hostile to the true owner. In the next place there was no understanding that Coppinger was to hold any

other land for Hill than that which was inclosed. On the other hand the contract was limited to that portion of the land. The defendants under this improvement can only avail themselves of the plea to the extent of the land actually inclosed.

The defendant, Virgil Hill, relies upon improvements to perfect his title to the conflict between the lands which he acquired from his father under grant 5054 with grant 4936 of the complainant. The facts of this possession are: Between seven and eight years before this case was tried in the federal court Mr. Hill built a log house on top of the mountain, and covered it and camped in it while he was doing some work on the road. He says:

"I first built a log house there, and covered it, and camped there and worked on the Peak road. I stayed there a good bit; then I rented it to some parties to stay in and cut staves bolts for Seaman, and that house stood there something like eight years. Just before our case was tried at Nashville, that house burned up. Then the next year, in less than a year, and some time the next year, I built a house there the next spring. It was kept up and closed the best I could keep it done. I would go and shut it up, and right straight it would be broken open. I don't know who by. It was done often, and every time I passed I would close it. Somebody would leave it open, and I would always close it, and very likely the next time I would go back it would be open again."

The record of the federal court proceedings shows that the suit was begun May 31, 1912.

The only record of a trial is an order showing a voluntary nonsuit March 9, 1914, and counting eight years back from that date would make the erection of the log house in

May 1906, or less than six years before the suit was begun. This record shows that the trial, just before which the house was burned, could not have been as much as seven years from the date of the building of the house. Certainly the proof as to the length of time it was maintained is too indefinite and uncertain to enable the court to say that the necessary period of time had expired. In addition to that, the character of the use of the house was not such as to show continuous adverse possession.

In the case involving complainants' grant 4940, all the defendants rely upon an adverse possession to perfect title to that portion of the title in conflict with grant 5055, upon an improvement known in the record as the Deering possession. This improvement consists of about twenty acres of cleared and inclosed land and a dwelling house. The improvement was originally made by H. L. W. Hill, and was used and occupied by him and his tenants and by his successors continuously for sixty years. Unquestionably it was of that character, and maintained for the requisite period to perfect title to the conflict between these two grants, but for the reasons set up by the complainant in opposition thereto. That is to say, complainants contend that the improvement is limited or impounded to the boundaries of what is known as the Samuel Turney tract of six hundred and fifty acres within which it is located. There are two reasons assigned by the complainant for this contention: First, that grant No. 5055 upon its face excludes all older and prior claims, and that the Turney tract, being older, and a special entry within its ouside boundaries, is excluded thereby, and that therefore grant 5055, under which it must have been held in order to perfect the defendant's title, was not color of title to the land upon

which the improvement was located. Secondly, that the Turney tract of land during the running of this possession by Hill was by him considered and treated as a separate tract of land, and possession was held thereon under his deed thereto, and not under the grant. The entry upon which grant 5055 is based, upon its face excludes all of the land held by legal claims, and the grant itself excludes one thousand and ninety acres held by older titles. The Turney entry was made in 1827, and was shortly thereafter surveyed. As far as this record shows, no grant was ever issued upon it. Certainly none had been issued at the time of the issuance of grant 5055. If the Turney entry is special, it is excluded by the grant, there being no showing that the exclusion clause in the grant is applicable to any other prior entries or title. *Bleidorn* v. *Pilot Mountain,* 89 Tenn., 169, 204, 15 S. W., 737.

Thus there is presented the question of whether the Turney entry is a special entry.

The entry reads: "Samuel Turney enters six hundred and fifty acres of land in Warren county, Tennessee, on the top of Cumberland mountain on the head waters of Collins river or creek called Little Laurel near a trace, beginning one-half of a mile north of a spring that rises near an improvement called the Ambrose cabin, running thence west, thence south, thence east, thence north, thence west to the beginning, so as to include the said spring and improvement, cabin, the Ambrose cabin, in the center or middle of said survey, which is intended to be in a square form."

So far as this record shows, no grant ever issued on this entry, but it was eventually surveyed, and the surveyor filed a plat and certificate of survey. The plat shows the location of the spring and of the cabin within the boun-

daries of the survey, and the certificate of survey calls for all the places referred to in the entry, including the improvement called the Ambrose cabin. In relation to specialty, entries are divided into three classes, such as are special, vague, or indifferent on their face. The first class includes those which for locality contain references to place "historical, traditional, or well-known to the people of the country." Of this character are entries calling for easily ascertained points on well-known water courses, county corners, etc. These require no auxiliary proof or foreign aid to ascertain their locality. This is true for the reason that the court takes judicial notice of the fact that the places are of such character that they can be found by persons acquainted in the neighborhood, and that subsequent enterers may know therefrom where the entry is located. Entries have been placed in this class where the boundary of the land is specific and definite, and require no aid for notoriety of the locative call. The second class cannot be made good by any extrinsic proof, either possessing no call for specialty or requiring greater exertions to ascertain such specialty than is reasonable; as, for instance, an entry calling to lie in the woods in the State or particular county might properly be said to possess no call for specialty; but even if calling to include a tree marked in a particular manner, the entry would still be void as requiring greater exertions and industry to find the tree than are consistent with the avocations of mankind. The third class of entries are those which may be available or 'not as the proof in the case shall make them special or vague. If the places called for are located upon the ground and are sufficiently described and are sufficiently well known to be ascertainable by reasonable

industry by those acquainted in its neighborhood, then such entries are special when such proof is made, but are to be treated as vague unless these facts are made to appear.

Clearly the Turney entry does not belong to the second class, because, if the description contained in the entry is not sufficiently defined, and the objects called for not suffi· ciently pointed out to form a presumption of notoriety, it certainly affords sufficient notice upon its face to give it the required notoriety if the places and improvements called for actually exist, and are well-known objects in the neighborhood. We do not think that the entry is such as that from it alone the court will presume the existence and notoriety of the objects called for, but it falls within that class of indefinite entries which are special upon proof of the existence or notoriety of the locative calls, such as are cited and referred to in the Bleidorn Case, 89 Tenn., 166, 204, 15 S. W., 737. There is no proof in the record to aid the specialty of this entry or to condemn it, other than that which may be afforded by the official plat and certificate of survey. The burden of proof is on the party relying upon the specialty of the entry to make proof thereof, the entry being produced. This burden is met in this case by the official plat and certificate which show the spring and the improvements called for, and locate them as they are called for in the entry. In *Wallen* v. *Campbell*, 2 Overt., 322, the court, in discussing the subject of entries of the three classes named, and speaking particularly to the point of the effect of the plat and certificate as affording evidence of specialty says:

"In fine, it may be remarked, that the law presumes that all entries standing indifferent as to specialty on their

face, may be rendered as available by proof; that when the surveyor in his plat, calls for the specialties of the entry, it is presumptive evidence of the sufficiency of such specialties, and consequently throws the *onus probandi* on the party opposing the validity of the entry."

The rule of law as thus stated is not modified by nor in conflict with that of *McEwen* v. *Coal Co.*, 125 Tenn., 694, 148 S. W., 222. It was held in that case—and the ruling is recognized as being sound—that an entry could not be made to possess the qualities of specialty by the survey. That is to say, if the locative calls of the entry were not such of themselves as would make the entry special, they could not be made so by the survey. In that case the holding was made with reference to an entry that was vague upon its face. Such is not the case we have under consideration. Here the entry possesses all the qualifications of a special entry upon proof of the location and notoriety of the objects called for, and it is only a question of where the burden of proof lies. The plat and certificate of the surveyor constitute a public record, available, not as conclusive of the specialty of the entry, but, where the plat shows the objects called for as being located within the entry as called for, and the survey refers to the objects mentioned, the court will upon this evidence presume the facts stated by him to be true, and place the burden of disproving the special qualities of the entry upon the parties opposing it.

There being no proof to the contrary, this entry must be considered as a special entry, and the possession maintained within its boundaries by H. L. W. Hill were ineffectual to perfect the title to any portion of the land within the boundaries of grant 5055, since the land upon

which the improvement was located was excluded from this grant, and it was not color of title thereto. During the time that this possession was being maintained by H. L. W. Hill, he had a deed to the specific boundaries of the Turney entry, which was a color of title, and by which he perfected the title to the extent of the boundaries thereof.

However, it appears that this improvement has been kept up and maintained by the defendant Sue Hill since she acquired a deed to her allotment in the partition of her father's land from J. C. Biles, clerk and master, January 2, 1894, which takes in and includes this possession as well as the boundary of the lands described in the Turney entry, and the deed therefor to her father, H. L. W. Hill. The mere fact that this improvement had been on the Turney entry for more than seven years· would not necessarily limit the operation of the possession maintained by the defendant Sue Meyers after she acquired color of title under her deed in 1894, but it would operate to the full extent of her boundary. This necessarily follows from the rule announced in *Bon Air Co.* v. *Parks,* 94 Tenn., 263, 29 S. W., 130, unless it is prevented by reason of the fact that the title to the boundary of the Turney entry had been previously perfected, and thereby establish the ownership of that tract in such a way as that subsequent possession thereon, under a deed including other lands, could not be said to be adverse to the real title to the extent of the boundaries of the new deed.

By his possession of the Turney entry under his deed, and having no other color of title thereto at the time, H. L. W. Hill tolled the real title to himself. *Coal Co.* v. *Scott,* 121 Tenn., 118, 114 S. W., 930. The real owner had no title to that portion of the land, and possession of it

thereafter was no interference with him, and could not be adverse beyond the boundaries of the superior title, and other lands of the complainant could not be taken by possession not outside of that boundary. *Daniel* v. *Coal & Iron Co.,* 132 Tenn., 510, 178 S. W., 1187; *Byrd* v. *Phillips,* 120 Tenn., 14, 111 S. W., 1109. This well-established doctrine is not modified by the case of *Round Mt. Lumber Co.* v. *Bass,* 136 Tenn., 687, 191 S. W., 341, and other cases dealing with the effect of possession as presented in cases of forcible and unlawful entry and detainer.

It follows that the defendants have not defeated the complaints' title by reason of the possession under discussion other than to the extent of the Turney entry.

There is some discussion in the briefs of both sides of whether the failure to obtain a grant on the Turney entry within the time allowed by law for taking out a grant had the effect to bring the land within the conveying feature of grant 5055. There is no basis for that question here, if our conclusions as to the inferiority of grant 5055 be accepted. That grant passed no title whatever to any land, not even what it purported to pass, and *a fortiori* could not draw to it title to land that was excluded. Besides the unreported decision in the case of Northcutt is sound wherein it is said:

"We think, therefore, there is no escape from the conclusion that by operation of the exclusion clauses contained in the grants under which complainant claims these grants never covered the land now in dispute, but that this land under the case stated belongs alone under the Bradshaw grant, No. 9941. If that land was not covered by complainant's grants when they were issued it could not be placed there by the *hiatus* between the Bradshaw

entry and the Bradshaw grant which occurred in November, 1841. Upon the intervention of the *hiatus* the land covered by the Bradshaw entry simply went back to the State."

The defendant Brush Creek Coal Company relies upon adverse possession by reason of there having been maintained on the conflict of this grant of the complainant with its grant 5107 an improvement known as the John Christian or Isaac Hill possession. The proof shows that there has been maintained at this place a house and improvements continuously since about 1843. About that time, a house having been built, and some land cleared up, Christian moved on the land and continued to live there for twenty-five years or more. On July 6, 1837, Isaac Hill, for whom Christian held possession, obtained a grant for a one hundred-acre tract of land upon which this improvement was located, and upon which it has since been maintained. There is some controversy in the testimony as to whether this grant has been located so as to include this improvement, but the weight of the proof shows that all of this improvement is inside of the one hundred-acre tract except an insignificant portion across the line. In 1839 Isaac Hill, the grantee, under the one hundred-acre grant, purchased the Barrel grant, No. 5107, at a tax sale. The contention of the complainant is that the Isaac Hill one hundred-acre grant is superior to the Barrel grant, and that this possession must be limited to the boundaries of the one hundred-acre tract. The position of the defendant is that the Hill grant was inferior to the Barrel grant, and that, inasmuch as Hill went into possession after he acquired the tax deed, the possession must be treated as

having been held under that deed rather than under the inferior grant to the one hundred-acre tract.

If the title to the one hundred acre tract is superior under the Isaac Hill grant thereto, the contention of the complainant is sound. The Isaac Hill grant is later in date than the Barrel grant, and, in order for it to be superior; it must relate to the entry upon which it is based, and in order to do that the entry must be a special entry. The entry, which is No. 2639, made September 11, 1828, reads as follows:

"Hevelow Forrester enters one hundred acres of land in Warren county, Tennessee, on the Tarkiln branch, waters of Collins river on Cumberland Mountain, beginning on a white oak near the path that Hill cut out on said mountain, and also near the bluff of the gulf, running thence southwardly, thence eastwardly for complement."

This entry certainly is not a special entry without proof of the notoriety of the objects called for. There is no proof on the subject. Furthermore, we think that it falls within the class of entries described as vague, and is not susceptible of proof. The call is merely for a white oak near a particular path. There is no claim in the entry that the white oak is designated in any particular way, and it is probable that thousands of white oaks could be found along this path at different points. It is not aided by the call for its being located near the bluff of the gulf. This entry is not special, and the title to the land did not pass by the grant because it had been previously granted, both by the complainant's grant and the Barrel grant under which the defendants claim. It cannot, therefore, be said that the possession maintained at this point was not adverse to complainant's title. Neither

can its operation be limited to the Hill grant merely because it happened to be within the boundaries of that grant. At the time it was put there Isaac Hill claimed under his tax deed the full extent of the Barrel grant. There is no proof to show that he did not claim to the full extent of the boundaries thereof.

It is contended by the complainant that the tax deed is not color of title because it only purports to convey such title as was held by the persons against whom the assessment was made, and in whose names the land was sold. As a matter of fact the land was not sold in the name of the persons who held the grant, and it is true that the title of the holders of the grant did not pass by the tax deed, but the tax deed does purport to convey the land. Upon its face it shows that the persons in whose name the land was sold were the owners of it. The mere fact that the actual title did not pass does not mean that the tax deed did not purport to pass the title. It does upon its face do that, and we are of the opinion that it is color of title sufficient to make the possession maintained under it operative, and perfect the title thereto by adverse possession, under the statute of limitations. In addition to that, the defendants and those through whom they claim have continued in the possession of this land under deeds which beyond question purport to convey the land, and for a length of time more than seven years, and by reason of which the defendant's title to this conflict has been perfected. Another contention of the complainants is that the tax deed does not sufficiently describe the land, and that the description cannot be aided by proof. It is true that this deed does not upon its face identify the land conveyed by the tax deed as being grant No. 5107, but it

So. Coal & Iron Co. v. Schwoon.

does call for the corner of another tract of land which the other evidence shows that the Barrel grant 5107 adjoined. The proof is ample to show that the land described in this tax deed is the same land as that granted by 5107, of which the land conveyed to the present defendants is a part. If this were not true the deeds under which the defendants have held it since the sale thereof by Isaac Hill are sufficient to identify the land and perfect their title under the statute of limitations.

The decree of the chancellor will be modified so as to conform to the conclusions indicated in the opinion. The defendants against whom no recovery is had will pay no costs, but the costs will be divided equally between the complainants and the defendants against whom recoveries are had.