[S. C., ante, 15.]
The plaintiff, Samuel Kerr, claimed under a grant to Joseph Kerr, for 640 acres, surveyed March the 8th, 1787, and dated May the 19th, 1789, which was conveyed to the lessor of the plaintiff, on the 8th of February, 1791. The entry on which the grant was founded was made the 30th of December, 1784; it calls to lie "on the north side of Cumberland River, on the dividing ridge between the waters of White's Creek and Buckanon's spring branch, bounded on said Buckanon's line to the west, and Swanson's line to the north: beginning at said Buckanon's south-west corner, running along said Swanson's line west to include a spring marked D, L, and north for complement." *Page 354 
The defendant claimed under a grant for a service right, which issued to John Ford, for 640 acres, dated February 15, 1786, surveyed the 11th of July, 1785. This grant was founded upon an entry dated March the 29th, 1784, the calls of which were to lie "on the north side of Cumberland River, and on the north side of Thomas's Creek, beginning on Noland's east line, running up on both sides of the creek."
The lands were surveyed in the manner pointed out in the subjoined plat.[1]

The defendant had been twenty-one years in possession, and in order to remove this ground of defence a suit had been commenced by ejectment by the plaintiff against the defendant and others on the 11th of August, 1795, which terminated in the year 1796, in favor of the plaintiff as to the other defendants, but against him as to the defendant Porter. A bill in equity was instituted by the plaintiff against the defendant on the 6th of September, 1798, which was dismissed without prejudice in the year 1802. The present action was commenced on the 22d of April, 1805.
It was proved that some of the upper drains of *Page 355 
Thomas's Creek, called for in the defendant's entry, headed in the southern part of the tract as surveyed, but the main creek headed further north, and more east; that no part of the main creek, which was but a branch at this place, ran through Ford's tract, part of which the defendant claimed: that it headed northwardly, and ran southwardly, leaving the south-east corner of Ford's tract to the west, passing through the south-east corner of Noland's pre-emption. It was also proved that the plaintiff's claim was surveyed agreeably to his entry.
[1] The tract represented by the letters A, B, C, D, is Kerr's; that represented by the dotted lines is Ford's, under whom the defendant claims.
The first inquiry here is who has the oldest grant; he who has must have the legal right on his side, and must hold, unless the other party has an equitable right superior to the equitable right of the person having the legal title.
As the defendant has this legal right, we will inquire whether it is overreached by the equitable right of the plaintiff. In order to ascertain this, it will be necessary, first, to examine the statutes of North Carolina relative to the appropriation of lands: for, so far as the legislature have declared their will, we must be bound by it, both in law and equity;[3] and, secondly, apply those principles to the case before us.
In the examination of the first, we will begin with entries. The fifth section of the Act of North Carolina, 1777, is the ground upon which an opinion of entries must be founded. This section directs the enterer to describe in his entry such remarkable places as may be within the tract, or artificial or natural boundary lines of others it may adjoin. It then directs that an order of survey shall issue from the *Page 360 
entry taker. The section does not disclose to us what is the primary intention of the entry; the surveyor is then directed to survey, and the manner of doing it, and of making his return, is pointed out in sect. 10.
The next act which seems applicable to this subject, is that of April, 1779, c. 6, § 6, which directs surveyors to survey according to priority of entry; the Act 1783, c. 2, directs the same thing; April, 1784, c. 14, § 7, directs that surveys shall be on the land entered "as nearly as may he agreeable to the locations thereof;" 1786, c. 20, and 1787, c. 23, are also directory to surveyors in making surveys, so that the first enterer shall have the preference. And from them it evidently appears that the first care of the legislature was to prevent interferences; that the oldest special enterer should have his land, and if the whole or a part of the subsequent enterer's land be taken by an older entry he might have the liberty of removing or taking the quantity elsewhere. April, 1784, c. 14, § 7: October, 1784, c. 19, § 6; 1786, c. 20, § 7; 1789, c. 3.
Taking all these acts together, we find that the legislature designed that the oldest enterer should obtain a grant in preference to others; and previous to the Act of 1786 it was intended that that grant should be conclusive. The preamble to the Act of 1786 contains a declaration of the understanding of the legislature on this subject.
If any doubt should remain upon former acts this puts the question at rest, and shows it to have been their intention that the oldest enterer should get the oldest grant. When they made this declaration it was perceived that interferences had taken place, notwithstanding the care used to guard against it by the directions given to their officers, entry takers, surveyors, and secretary.
The first land law, passed November, 1777, c. 1, § 10, clearly shows that it was the intention of the legislature that surveys should not interfere. It directs surveyors, when running out entries, to do it in a square or oblong, not exceeding in length twice its breadth, "unless where such lines interfere with lands already granted or surveyed, or unless where *Page 361 
the survey shall be made on any navigable water; in which last case the water shall form one side of the survey, and the breadth on such water shall not be more than one-fourth part of the distance back from the water." In the seventh section of the Act of October, 1779, c. 4, there is a provision for persons having made, or who thereafter should make, entries on navigable waters, that if the surveyor, in running out the lands, "shall be prevented from running out the same agreeably to the directions of the before-recited act (November, 1777, c. 1), by the boundary of any land heretofore run out, that then and in that case the surveyor may and shall run out and survey the same in the same manner that other lands are directed to be laid out." Beside the general scope and language of the statutes, this provision, with that contained in the seventh section of the Act of April, 1784, c. 14, unequivocally expresses the design of the legislature that surveys should not interfere or run into each other, though in the act of avoiding it the surveyor should be obliged in some measure to depart from the directions of the entry. The language of the last act is, that the survey shall be as near as may be on the land entered.
The next step will be to ascertain the meaning of Ford's entry. Upon that part of it which calls to adjoin Noland's east line, no opinion will be given, supposing it stood alone without any other description. There seems, however, to be strength in the argument that the south boundary could not have been meant, for in this view, and running up the creek, as the entry called for, it would cover Noland's land, which cannot be supposed, as the entry calls to adjoin; and being an older claim, it is a fair conclusion that Ford did not design to interfere with it; if it had been made to adjoin the eastboundary of Noland, and run up the creek, nearly the same land must be included that now is.
As to the conformity of the survey to the entry, it has been insisted that the survey should have joined Noland's north boundary its whole length. I am not prepared to say this, even if older claims had not interfered, but as the survey was confined by older claims the surveyor did his duty when he *Page 362 
confined himself to the lines of those claims, and he was authorized to run until he included the quantity called for. This was one of the points determined in the case of Hoggat v. M'Crory and Gillaspie. The surveyor had his election to run the entry in a square or an oblong, if older claims did not interfere; where that was the case, he was authorized, or rather constrained, to depart from that method, and run it bounding on old lines, until he got his quantity agreeably to the tenth section of the Act of 1777. In this view of the subject, supposing the north boundary of Noland to be the line called for, upon which no decisive opinion is given, it seems that the survey of Ford is correct.
After having said thus much of the entry and survey of the defendant, it follows that something should be said with respect to the statute of limitations.
Unless the operation of the statute is interrupted by the institution of the suits at law and in equity, the statute will bar this claim. Upon this part of the case I am not prepared to give an opinion that would be satisfactory, not having time to consider it, further than this, that it seems as if the. institution of a suit in equity will hinder the running of the statute, as well as a suit at law.[1]
The reasoning on the part of the plaintiff, with respect to the institution and termination of the suits, is far from being satisfactory.
[1] Sch. Lef. 413, 425.
[3] See Hardin, 472.