Ejectment; plea not guilty, and issue as usual. — The plaintiff had the oldest grant, upon which he relied without producing an entry. His boundaries were identified. To overreach the grant of the plaintiff, the defendant produced an entry of a pre-emption, No. 333, dated March 3,1784, which was older than the plaintiff's grant, in these words: "The heirs of Roger Topp, assignee of Joseph Denton, enters 640 acres of land lying on the south side of Cumberland River, on the third big creek above Stone's River, about two miles from the mouth of said creek, including an improvement, and marked on a tree near said spring W O, beginning one quarter of a mile north-east of said spring, running south and west."
As the testimony is referred to in the arguments of counsel, it were needless to repeat it.
We rely upon our grant, and the defendants must show that their entry is special, and covers the ground they claim; if they fail in this we must recover. William Overall made the location. Barton and Buchanon went with Overall to show the place, so that Buchanon, who was a surveyor, might survey it.
The great dispute in this case is, which of the two springs was the place called for in the defendants' entry.
There is proof of an upper and lower spring on this creek; we say the upper spring, now claimed by Conrad, is the place located by the defendants, and, if so, there they ought to make their claim, and then there could not be any interference. The upper spring is between five and six miles, and the lower between three and four miles, from Cumberland River.
The lower is the spring we claim, and where our land was surveyed. The lower is about sixty yards, and the upper about a quarter of a mile, from the creek. There is great difference in the springs, as to their size, situation, c., so that no person could mistake one for the other. But to proceed with a view of the evidence, which we insist shows satisfactorily that the defendants' entry was made for the upper spring, and not for the lower, which we claim. When Buchanon was out, in order to survey the defendants' entry, in company with the locator and Barton, and perhaps Rains, the guardian of Topp the heir of R. Topp, they were first at the upper or Conrad's spring; the locator said that was not the place, nor did he claim our spring, which they were also at.
Buchanon came away, and left him looking for the spring.
It will be however recollected that Buchanon had previously surveyed some claims which called to adjoin the defendants' entry, near this place. Kilgore had a guard right of 800 acres, the entry of which was made January the 26th, 1784, on Barton's Creek, as now called, being the same on which the land in dispute is situated, "beginning on Roger Topp's upper line, and running up the creek on both sides." *Page 12 
It is true, this entry was made before Topp's, but it could well call to adjoin it, as all the pre-emptioners had obtained certificates from the commissioners before any entries at all were made. Kilgore's entry has long since been established, surveyed, and granted. It was surveyed, leaving room for Topp's at the upper spring. Overall and Flinn are both dead, but Barton says Overall told him that Flinn was with him when he made the improvements and marks at the spring.' We have Flinn's voluntary affidavit, which has been read as his declaration, being dead, and the transaction of long standing. He, or some other witnesses, tell us that he made Kilgore's improvement; and Flinn positively tells us that the upper spring is the one called for by Topp's entry. Kilgore calls to adjoin it at that place, which of itself forms an irresistible presumption that it was the understanding of that day that the upper spring was the place intended.
J. Payton says that Overall told him in his lifetime, in the year 1783, the upper spring was the place he located for Topp; and it is probable it would have been still claimed for him if Conrad had not obtained it. Payton always understood so, and so did Buchanon previous to Overall's going out with him. Payton saw marks at the upper spring in early times, but does not recollect what they were.
There was not a single witness who has proved marks at the lower spring. He also says that Captain Bowen, who is now dead, told him that Topp and himself had made an improvement at a spring, about three-quarters of a mile from a big pond, mentioning the course from the pond. He inquired of Barton for the pond, who told him where it was; he found it, and, agreeably to Barton's directions, went the course from the pond Bowen had told him, and came to the lower spring, where he saw some trees chopped, but no marks.
Bowen was with him at the spring, and said it was the place Fowler had improved in early times, as Fowler had told him; though Bowen was not at the spring, but lay in camp on the other side of the creek. S. Williams, who surveyed our land, says that he found no marks at the spring. He saw the *Page 13 
white-oak trees, which had been chopped with a knife or tomahawk.
The argument that entries need not be as special here as in Virginia was idle. Entries there, as well as here, were intended for the same purpose, — to give notice to others of the appropriation of the land. It must contain sufficient certainty to do this; and certainty was the same everywhere.
It is urged that, by a rational construction of the defendants' entry, as the tract must necessarily lie on both sides of the creek, the spring must be near the creek. This might be the case with respect to 640 acres, or any small tract, but how would the argument apply if it were 2000 acres? The law being the same, it must apply in a large as well as a small tract.
It is of great importance that the principles of law with respect to entries should be settled, and, if possible, ascertained. As matters were hitherto, no man had any clew from which he could tell whether his claim were good or not; and can only make an experiment, at this expense of perhaps four or five hundred dollars.
Surely the only possible construction that can be given to our law respecting entries is, that it should contain sufficient certainty to give others notice of the spot called for in it, so that they may know how to avoid it, and enter in safety adjoining. Nothing else could have been intended. We have understood that this, for some years back, was the opinion of the courts respecting entries; and why should it not continue so? Men's rights would then have some foundation to stand on: now they have none. The entry of the defendants is uncertain and vague. Pre-emption claims ought not to be encouraged. Most of them were obtained in fraud of the law, which required particular kinds of improvements, when it is well known that the greater part of them were obtained without any improvement at all. Ours is a military claim, theirs a pre-emption.
In relation to the mode of surveying, it is urged that the oldest entry ought to be first surveyed. Suppose the youngest should be first surveyed (which we think would be legal), would the grant be void: *Page 14 
No. The Act of 1786, c. 20, only says, it shall be void if obtained in fraud of an elder entry. It cannot be seen, why more favor should be shown to elder than younger entries. It is not material to society, which holds.
The profit or loss to the public is the same, whether one man holds or another. But we insist that a younger innocent enterer, should be preferred to a person claiming under an older vague one; the calls of which are so uncertain that no person could ascertain its locality.
The plaintiff has not produced an entry; we cannot therefore suppose that he ever had one. That which is not proved cannot be presumed. It appears from the testimony that when Buchanon came away, and left Rains and Overall looking for the spring, Overall afterwards, as he said, found the marks at the lower spring, and said that was the place; in consequence of which it was surveyed for Topp. Mr. Harpole tells us that Bowen in his lifetime, told him, the spring at which he lives, a small distance from the lower one, was the place Fowler improved, which completely removes all weight from what Bowen told Payton. What Overall, the locator, himself stated is superior to all the testimony of the plaintiff put together.
Our entry is special. It has been insisted that an entry should be so special that it will give notice to others in such a manner that they may know how to take up the adjacent lands in safety. From whence is this position derived? From the language, or fair interpretation of the Statute of November, 1777, c. 1, § 5.
This section requires that the person making the entry shall state remarkable places, watercourses, or lines of others. It surely will not be contended that if all these calls were not in an entry it should be void. Some of them perhaps could not be found at or near the place.
The true principle of law is, that the entry should contain so much specialty as would be sufficient to *Page 15 
put others on inquiry, and enable them to find the place. Does our entry disclose facts sufficient for this purpose? We must presume it does. It calls for objects of notoriety; as, —
1st. The third creek above Stone's River, on the south side of Cumberland River.
2d. About two miles from the mouth of the creek.
3d. A spring with its description.
The difficulties and dangers that surrounded the first adventurers of this country ought to be taken into consideration in the construction of entries. The few people then in the country had it not in their power to explore it so accurately as it has since been done in a full state of population and freedom from danger of savages.
The entry however would be special at this day. It calls to lie on the creek, therefore the spring must be near it, as by a fair construction the land must lie on both sides of the creek. It was not intended that the distance above the mouth of the creek should be exactly described; the words of the entry do not import that. It was not to be expected that locators measured the ground. The spring we claim, is sufficiently near in that respect; other facts disclosed show that it must have been the lower and not the upper spring; besides, the distance answering better. If you take the upper spring, it would lie in one corner of (he tract, and the land not on both sides of the creek, which the entry surely means.
In construing an entry it is not a fair interpretation to select one particular call of it, and if that fails all shall with it. It should be taken altogether, and if any one notorious call shall be established, it is sufficient.
Entries much more vague than this have been supported, and if this is not, but few will. Burn's Lessee v. Hays.
The Act of 1786, c. 20, which speaks of special entries, does not define what shall be so considered. The fifth section of November, 1777, c. 1, must be *Page 16 
recurred to, and that says nothing about a special entry.
We are left then to inquire into the nature of a special entry, by considering what the legislature had in view in requiring an entry. From the situation of things the legislature never could have designed that an entry should contain that technical certainty, for which the counsel of the plaintiff contend. Scarcely one in a hundred would stand the test. The defendants' entry being the oldest, the plaintiff ought first to have seen it run out.
He had a preference in getting it surveyed.
Mr. HAYWOOD rose and said, they had just discovered a witness who was with Overall when he made the letters called for at the spring, and could prove it. He desired permission to introduce him.
stopping the counsel on the other side, observed, that the witness could not now be introduced. It had often been decided that, after the arguments were opened, no witness could be brought forward. In fact after a witness has been discharged from his examination, in the course of regular practice, he cannot be examined afterwards. The courts however frequently permit it, as the counsel may have omitted some material question.
The Court will however know, before the witness is re-examined, what the question intended to be asked is; so that it can see it was an omission, and the examination not designedly kept back for the purpose of seeing where the testimony pinched on the other side. No instance to his knowledge had ever occurred where a witness had been examined after arguments commenced.
In practice, calling back witnesses after being examined had proceeded great length; it should be avoided as much as possible. The discovery of testimony alluded to by the defendants' counsel may be a ground for a new trial, but it would tend to introduce too much confusion and disorder in the practice to permit its introduction. Besides, it will encourage perjury; for, if we permit it at one part of the argument, we may at another; and, before the *Page 17 
closing of it, a party might see where the weak place of his cause was; and in that case be prepared with a witness to support it. It is not however intended to suggest a suspicion that any such thing is in view in this case; far from it, but it would be the tendency of such a practice.
HAYWOOD was proceeding, when he was stopped by HUMPHREYS, J., who said that he could see no difference between admitting the witness now and upon another trial, which the defendant would be entitled to, upon disclosing the discovery and materiality of the witness. He might then supply a weak place in his cause as well as now; nay, better, for there would be more time. Justice requires that we should hear his testimony at some stage of the controversy, and he thought it was saving time and attaining the ends of justice to do it at once.
HAYWOOD then argued, at considerable length, in favor of the introduction of the witness; and per