A. E. Dearing, Complainant, Respondent, *v.* N., C. & St.
L. Ry., Defendant, Petitioner.

(*Nashville,* December Term, 1931.)

Opinion filed April 30, 1932.

R. W. MILNER, J. J. FINLEY and ROBERTS & ROBERTS, for complainant, respondent.

F. H. Mercer, Fitzgerald Hall, W. B. Lamb, George Banks and A. T. Stewart, for defendant, petitioner.

Mr. Justice Swiggart delivered the opinion of the Court.

This is an ejectment suit to gain possession of approximately 1100 acres of land in Franklin County. The complainant, Dearing, unsuccessful in the Chancery Court, appealed to the Court of Appeals, where the decree of the Chancellor was reversed and a decree awarded him. The defendant's petition for the writ of *certiorari* has been granted and argument of counsel has been heard.

The land in controversy was purchased by the Railway in 1869, and operations were conducted thereon for cutting timber to provide fuel for its wood-burning locomotives. Certain buildings were erected on the land in aid of those operations, but these fell into disuse and were destroyed, and the Railway was unable to prove title by adverse possession for seven years. Such defense, presented by the answer, was abandoned in the Chancery Court, and the case was heard and determined by the Chancellor on the proof as to the legal title of each party, deraigned to conflicting grants issued by the State of Tennessee.

Complainant's title is founded upon grant number 5978, dated March 15, 1838; issued pursuant to entry number 90, dated August 19, 1837, including 5,000 acres.

Defendant's title is founded upon grant number 7000, dated August 7, 1839; issued pursuant to entry number 2307, dated February 6, 1837, including 2,000 acres.

Defendant's entry 2307 is of earlier date than the

entry upon which complainant's grant was issued, and therefore, although complainant's grant is of earlier date than defendant's grant, the title founded upon the younger grant and older entry must prevail if the entry can be held to be the inception of the title.

We quote the well established rule of law from *Southern Coal & Iron Co.* v. *Schwoon,* 145 Tenn., 191, 235-236, 239 S. W., 398: "It has become elementary that superiority of title is to be found with the holder of the title prior in date. This is not necessarily nor always determined by the date upon which the grant was issued, but it is to be determined from the date of the inception of the title upon which the grant is based. The grant will have its inception at the date of the entry provided the entry be what has in law often been termed a special entry to the extent that the entry and the grant cover the same land. If the entry be not special, then the date of the grant based thereon is the inception of the title."

In the application of the rules of law to the controversy of the case before us, we must determine (1) whether the entry 2307, relied upon by the petitioner as the inception of its title, is a special entry, as that term is defined and understood in the cases, and (2) whether the land granted is the same land as that covered by the entry. Both these points were expressly ruled by the Chancellor in the affirmative, in accord with the contention of the petitioner.

In this investigation we are conscious of treading paths marked out and defined by the founders of our jurisprudence, and are mindful of the admonition of one of the greatest of our land lawyers and judges, in *McEwen* v. *Coal & Land Company,* 125 Tenn., 694, 718,

148 S. W., 222: ''The land system of this State is very complicated and very artificial. It has been matured by decisions of this court construing the various legislative enactments upon which it is founded, and at this time we are not permitted to indulge in a course of reasoning of our own, independent of the rules established by the early cases. . . . This system, in its particular application, belongs almost exclusively to the past, and to unsettle it now, or in the least shake or disturb any doctrine affecting the title to land, would produce unspeakable disaster.''

 The description contained in entry 2307 locates a beginning point in the south boundary line of a 1200-acre tract of Richard Sharp, the location of which is not now controverted, and ''runs west . . . in all 322 poles to the southwest corner of Richard Sharp's 1200 acres, and north and west and around to the best advantage so as to adjoin said 1200 acres on the south and west to get the quantity and not interfere.''

We have no difficulty in concluding, with the Chancellor, that the description contained in the entry is sufficiently definite to classify the entry as a special entry, which may be the inception of a title to land granted pursuant thereto. We quote again from *Southern Coal & Iron Co.* v. *Schwoon, supra*: ''An entry which has a special locative call, and calls to run north or south and east or west for complement, is special, because in such case the law directs the method of its survey, and requires it to be located either in a square or oblong form, unless doing so would interfere with the lines of prior claims or with navigable streams, in which latter case it may deviate from the required form. It is because of this requirement of the law that entries in a checker-

board system, such as were involved in the Bleidorn Case, and other cases, have been held to be special where the locative call in the initial entry met the requirements of the law with respect to speciality. *Berry* v. *Wagner*, 5 Lea, 564.''

An entry of land was not required to describe or locate the land entered with strict or absolute certainty. Certainty to a common intent was sufficient. *Berry* v. *Wagner, supra; Barnett's Lessee* v. *Russell,* 2 Tenn., 10, 19. It was sufficient that the entry gave notice of the ''neighborhood,'' and it was not expected or intended that it be so precise as to give notice of the ''boundaries'' of the land entered. *Kendrick* v. *Dallum,* 3 Tenn. (Cooke), 220, 229.

The Richard Sharp 1200-acre tract, referred to in the entry, was in the form of a square or oblong with its south and west boundaries running with the cardinal points of the compass. The land described in the entry could have been surveyed in the form of a square or oblong, as contemplated by the statute (Acts 1777, chapter 1, section 10), except that the previously granted Richard Sharp tract would have protruded into the northeast corner of such oblong or square, so as to destroy its symmetry. But the requirement of the statute was that the survey should be ''an exact square, or oblong, the length not exceeding double the breadth, unless where such lines interfere with lands already granted or surveyed.'' Acts 1777, above cited, quoted from Whitney's Land Laws of Tennessee, page 69. The statute thus expressly recognizing the authority of the surveyor to depart from the stipulated form of survey when necessary to avoid conflict with lands previously granted, the fact that a departure from such form was contem-

plated by the terms of the entry itself, to avoid such a conflict, does not destroy the specialty of the entry. If no other superior claims interfered, it would have been the statutory duty of the surveyor to survey the entry in the form suggested. The latitude left to the discretion of the surveyor in determining the length of the north and west calls was clearly within the degree of certainty required of a special entry, under the cases cited and others hereinafter referred to.

The survey of entry 2307 was made November 7, 1838, and was subsequent to the issuance of complainant's grant. The survey recites that, beginning at the point in the Richard Sharp south boundary, designated in the entry, and running thence west 230 poles, the survey encountered the east boundary of E. E. Thacker's 640 acres. Instead therefore of running to the southwest corner of the Richard Sharp tract, as directed by the entry, and thence north and west, the survey stopped 92 poles short of that corner and thence turned south with Thacker's east boundary, and thence further south with the east boundary of land previously granted to Patrick Smith. Thence proceeding, the survey includes a tract of 2,000 acres, the quantity called for in the entry, the boundaries of which are exceedingly irregular, with many offsets and insets in the boundary lines, made necessary as shown by the recitations of the survey by the boundary lines of the lands of numerous individuals named in the survey.

Petitioner's grant describes the land granted exactly as described in the survey, with the result that the land granted lay wholly south of the Richard Sharp 1200-acre tract, instead of south and west of it, and was in irregular form with the southernmost point nearly three

and one-half miles from the beginning point in the north boundary, and with a considerable portion of the granted tract lying east of the beginning point.

It should be noted, however, that the land now in dispute is the northwestern part of the survey, none of which is east of the beginning point designated in the entry; and the southern line of the disputed area is about 600 poles from its northern boundary, according to a plat filed by a witness for complainant and the averments of complainant's bill.

The ruling of the Court of Appeals is that the survey and grant under which petitioner claims so far depart from "the locative and restrictive calls of the entry" as to include lands not within its sphere, and that, therefore, the entry cannot be treated as the inception of the title to the land granted.

In support of this ruling, complainant contends that "the specialty of entry 2307 lies in the fact that it definitely describes the land entered," as adjoining the Richard Sharp 1200 acres on the south and west. In his supplemental brief filed in this Court, complainant says: "There is no room left for the surveyor to depart from this positive and mandatory description in the entry itself, for to do so destroys the specialty of the entry."

We are of opinion that the record conclusively shows that the surveyor, in running entry 2307 from the designated point of beginning, stopped short of the southwest corner of the Richard Sharp 1200-acre tract and turned thence south, for the reason that the lands previously granted to Thacker prevented a continuance of the line westward to the said corner. Grant number 3484 to E. E. Thacker for 640 acres, issued November 11, 1834, antedates entry 2307 by several years, and covers lands

lying west of the tract in controversy. Its east line is given in the grant as running north 78 poles to "two black jacks in the south boundary of James Sharp's 640 acres," which the record shows to be also the south boundary of the Richard Sharp 1200-acre tract. The grant therefore supports the testimony of defendant's engineers that the Thacker land was an obstruction, and supports the recitation of the survey itself that the line from the beginning corner of the tract in controversy reached the Thacker east boundary and then turned south with said boundary 78 poles. It was the duty of the surveyor to continue west if the Thacker grant had not interfered, and the law indulges a presumption that the surveyor, being a public officer, acted in accord with his duty. "Surveyors are officers of the government sworn to do their duty. In making surveys they are directed by law to conform to the entries; in doing this they act independently of the claimants and according to their best judgment. The law presumes every officer does his duty. (Citing authorities.) Under such circumstances every reasonable intendment ought to be made in support of their acts, so that those whose rights they are effectuating may not be injured." OVERTON, J., in *Blount* v. *Ramsey,* 3 Tenn. (Cooke), 489, 492; *Dunlap* v. *Sawvel,* 142 Tenn., 696, 707, 223 S. W., 142.

As indicated in the first quotation hereinabove made from Southern Coal & Iron Company v. Schwoon, the rights of the parties to the land in controversy are controlled by the determination of whether the land surveyed and granted is the "same land" as that described in entry 2307. "So far as the grant covers land not included within the entry, it stands unsupported by the entry, and must yield to any fair grant of an earlier

date." *Douglass' Lessee* v. *Harrison,* 1 Tenn., 172, 173.

But the use of the phrase "same land" in this connection is not to be understood as referring to identity of boundaries. Such construction would require of any entry the high degree of certainty expressly repudiated by the authorities cited hereinabove in discussing the specialty of entry 2307. We apprehend that the land surveyed is the same land as that described in the entry, if the surveyor, in making the survey, acts in accord with the discretion and authority vested in him by the law, without departing from the scope or sphere of the entry surveyed. "When the surveyor makes the survey, which is not contrary to the express meaning of the entry, by what rule of reason, law, or equity, can you deprive an older enterer of any part of his survey? . . . A latitude in making the survey is secured by statute; the legislature has so ordered it, and the younger enterer has no right to complain." *Philip's Lessee* v. *Robertson,* 2 Tenn., 399, 417; *Fly* v. *Lessee of E. T. College,* 34 Tenn. (2 Sneed), 688, 695.

The Act of 1777, chapter 1, section 10, required that the survey of an entry be made to conform to the cardinal points of the compass and in the form of an oblong or square "unless where such lines interfere with lands already granted or surveyed." It was the custom to conclude the direction of an entry, as in entry 2307, with the phrase "to get the quantity and not interfere." This statutory injunction against interference with older claims was clearly treated as of equal importance with the more specific directions for the survey. In *Kerr's Lessee* v. *Porter,* 1 Tenn., 353, 360, referring to this and later statutes, OVERTON, J., said: "And from them it evidently appears, that the first care of the legislature was to pre-

vent interferences; that the oldest special enterer should have his land, and if the whole, or a part of the subsequent enterer's land, be taken by an older entry, he might have the liberty of removing, or taking the quantity elsewhere. . . . Beside the general scope and language of the statutes, this provision (the Act of 1777, chapter 1) with that contained in the seventh section of the Act of April, 1784, unequivocally expresses the design of the legislature that surveys should not interfere or run into each other, though in the act of avoiding it, the surveyor should be obliged in some measure to depart from the directions of the entry. The language of the last act is, that the survey shall be as near as may be on the land entered." The opinion concludes with a reference to *Hoggat* v. *McCrory et al.,* 1 Tenn., 8, as supporting the rule stated by the court: "The surveyor had his election to run the entry in a square or oblong, if older claims did not interfere; where that was the case, he was authorized, or rather constrained, to depart from that method, and run it binding on old lines until he got his quantity agreeably to the tenth section of the Act of 1777."

The Act of 1777 referred to in the preceding paragraph was a statute of North Carolina. The practical construction given to the act in that state by surveyors, from the time of its enactment, is embodied in a note to *Hoggat* v. *McCrory,* 1 Tenn., 8, 13, including the statement: "It was also the common usage among surveyors in North Carolina, to survey the oldest entries first, to include the quantities called for in the entries by running into any contiguous lands which were not appropriated previously to the entries to be surveyed; and in making such surveys the square or oblong form was

departed from when constrained to do so by older claims.

*Philip's Lessee* v. *Robertson,* 2 Tenn., 399, treats exhaustively of the latitude allowed by law in making the survey of a special entry, and holds: "A special entry is always available, and uniformly has been considered so, in all the cases finally decided, to the extent of the quantity of acres called for in the entry, and included within the survey; unless restrained by the *express* terms of the entry, by natural boundaries, or by older claims."

*Caldwell* v. *Watson,* 25 Tenn. (6 Humph.), 498-499, ruled in accord with this custom. Calls of an entry to the west and then to the south being obstructed by older claims, the survey turned east and thence north; and although the calls of the entry located the lands entered as south of the beginning point, the surveyor was required by *mandamus* to include lands north thereof, in order to take in the quantity called for. The court said: "In this case the relator was restricted by older claims, south and west, and by the lake on the east, so as to throw him upon the land north for his quantity; and, as there is nothing in his entry restraining him from going north, it was the duty of the surveyor to extend his line north so as to obtain the quantity called for; for such running would have been in express compliance with the last call north, etc., for complement. The relator had a right to the quantity of land his entry calls for, which was vacant at its date, and which might be included by any proper mode of survey; and no subsequent claim could defeat that right."

*Walker* v. *Phillips* (1893), 92 Tenn. (8 Pick.), 495, 501, recognizes the authority of *Caldwell* v. *Watson, supra,* and quotes that opinion at length. The court (Caldwell, J.) said:

"The Legislature and the Courts have always been solicitous that the first enterer should have the first survey and a perfect title; and to attain that end surveyors have been required to run out entries in the order made, observing the calls of each entry in succession so far as that could be done without causing conflict. Avoidance of conflict has been deemed of more importance than a literal observance of calls; and, as a consequence, it has been made the duty of the surveyor to depart from the calls when and so far as it may be necessary to prevent interference with prior claims; and, if in doing this he keeps reasonably within the scope of the particular entry being surveyed, his survey is good and binding upon all persons whose claims originated subsequent to that entry."

The rulings in *Caldwell* v. *Watson* and in *Walker* v. *Phillips* rest upon the view of the court that the deviation by the surveyor from the calls or direction of the entries, made necessary in each case to avoid interference with older entries or grants, did not have the effect of including within the surveys lands which were not within the scope or sphere of the entries surveyed. On this ground the court, in *Walker* v. *Phillips*, distinguished the case before it from *Nolen* v. *Wilson*, 37 Tenn. (5 Sneed), 332, wherein it was held that the surveyor cannot be "allowed to depart from the entry to other lands not within its sphere, already legally appropriated by a younger enterer," and that an elder enterer, deprived of his land by the interference of better titles, cannot be "allowed to take other lands not within the scope of his entry, and already appropriated by a subsequent enterer."

The grant under which complainant claims called for 5,000 acres of land, in the form of a rectangle, 640

by 1280 poles. The beginning corner of entry 2307 lies in the east boundary line of complainant's grant, 587 poles from the southeast corner of that grant, and from that point the entry directed the surveyors to go west and north and around, "to get the quantity." If the older claims of Thacker and Patrick Smith had not interfered and the survey of entry 2307 had been made in exact accord with its directions and calls, practically the entire quantity of 2,000 acres would have been necessarily located within the boundaries of complainant's grant, instead of the 1100 acres involved in this suit.

The record contains evidence that there was some vacant land west of the Richard Sharp 1200 acres at the date of the survey, and it is contended that this should have been included in the survey instead of the land south of the Richard Sharp tract. But the complainant's grant extended westward 640 poles from the beginning point of entry 2307, and the land thus referred to as "vacant" was obviously within its boundaries, so that it stood with reference to that grant and title in exactly the same plight as the land south of the Richard Sharp tract included in the survey. This "vacant" land could not have been reached by the survey without passing over the Thacker lands, and we see no basis for complainant's contention that the land west instead of the land south of the Richard Sharp tract should have been included in the survey.

If there had been no superior and interfering claims to prevent, it would have been the duty of the surveyor, in running entry 2307, to turn north along the west boundary of the Richard Sharp tract, and then west and south and around to the beginning corner, so as to include a tract of land lying south and west of the Richard

Sharp tract, in the form of a rectangle, square or oblong, with the northeast corner indented to receive the protruding corner of the Richard Sharp tract. This would have been in strict accord with the entry and the provisions of the Act of 1777. The sides of a tract containing 2,000 acres, in the form of a square, are in excess of 565 poles in length; and if oblong, with the length twice the breadth, a form of survey authorized by the Act of 1777, the longer sides would be in excess of 750 poles in length.

Since all of the land in controversy lies south of the Richard Sharp tract, west of the beginning corner, and does not extend more than 600 poles south of the beginning corner, it is obvious that it is land which might have been included within a survey of entry 2307, executed strictly in accord with the directions of the entry and the Act of 1777. It is therefore impossible to conclude that the land in controversy was not within the scope or sphere of the entry, or that the surveyor departed from the entry in including it in his survey. The entry carried notice to the subsequent enterer that this particular land might lawfully be included by the surveyor in his survey of the entry, and the entry 2307 is therefore the inception of the petitioner's title to this land included in the dependent survey and grant.

We hold that the surveyor was authorized by the law under which he was acting, to turn his survey south upon encountering the interfering holding of Thacker, which prevented him from reaching the southwest corner of the Richard Sharp tract and from running the north and west calls of the entry. The irregular form of the survey was clearly made necessary by interferences which it was the duty of the surveyor to avoid. In so far as

the resulting survey included lands lying south of the Sharp tract and which were within the scope and sphere of the entry, the survey was legal and the lands so included were the ''same lands'' described in the entry. The land in controversy is such land, and the petitioner's title thereto must prevail.

(9) It is unnecessary that we here determine whether the surveyor departed from the scope of entry 2307 in extending the survey further south and east than would have been reached by a survey, including the quantity of land on the west and south of the Sharp tract, in any of the forms authorized by law. No such land is included in the present controversy, and the petitioner is entitled to a decree sustaining the survey and grant to the extent that it included land within the scope of the entry. *Southern Coal & Iron Company* v. *Schwoon, supra,* at page 243. If the survey included other lands not within the scope of entry 2307, the subsequent enterer, from whom complainant's title is deraigned, was not injured thereby.

It results that we reverse the decree of the Court of Appeals and affirm that of the Chancellor. Costs will be decreed against the complainant and his sureties.